[No. A097492. First Dist., Div. Two. Jan. 31, 2003.]

CURTIS D. MACKEY et al., Plaintiffs and Appellants, v.
BRISTOL WEST INSURANCE SERVICE OF CALIFORNIA, INC., et
al., Defendants and Respondents.

1248

1250

## COUNSEL

Robert A. Goldstein for Plaintiffs and Appellants.

Barger & Wollen, Steven H. Weinstein, Richard G. De La Mora, Marina M. Maniatis and Maria G. Aguillon for Defendants and Respondents.

Lord, Bissell & Brook, David Hauge and Charissa Dorian for National Association of Independent Insurers as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

RUVOLO, J.—

I.

INTRODUCTION

Under Insurance Code section 662,[1] when an insurer cancels an automobile liability policy for nonpayment of premium, it must give the insured at least 10 days' notice prior to the effective date of cancellation. Appellant Curtis D. Mackey (Mackey), on behalf of himself and the class he seeks to represent, filed this action against his insurance carrier, Coast National Insurance Company, Inc. (Coast), and his insurance broker, Bristol West Insurance Services of California, Inc. (Bristol West),[2] claiming Coast improperly denied coverage by its failure to give proper notice of cancellation for nonpayment of premium.

Coast sent Mackey a cancellation notice 13 days before the premium he failed to pay was due, thereby setting the effective date of cancellation on the day following the premium due date. The principal question we must address is whether insurers, such as Coast, may mail a notice of cancellation in advance of the premium due date; or whether it is necessary to wait until a default has actually occurred before mailing the statutory 10-day notice of cancellation.

We conclude that the cancellation notice Coast issued to Mackey for nonpayment of premium prior to the date on which the premium was due was in violation of section 662, and thus was ineffective to cancel his policy. Consequently, the court improperly sustained Coast's demurrer to those causes of action in Mackey's first amended complaint (FAC) grounded on the improper notice of cancellation of his policy. The trial court erred in determining that, as a matter of law, no coverage was owed.

However, we hold that the court properly sustained the demurrer to the remaining causes of action alleged in Mackey's FAC. These causes of action are based on the disclosure requirements of the Retail Installment Sales Act (the Unruh Act; Civ. Code, §§ 1801-1812.68); the cancellation notice given

---

[1] All undesignated statutory references are to the Insurance Code.

[2] In the proceedings below, Bristol West expressly joined in Coast's arguments. Consequently, we refer to Bristol West and Coast collectively as "Coast," except when otherwise stated. Furthermore, on November 6, 2002, the National Association of Independent Insurers was granted permission to file an amicus curiae brief in support of Coast's position in this appeal.

to the lienholder/loss payee under the terms of Mackey's insurance policy; and the cancellation rights of other Coast policyholders holding a different type of policy.

## II.

### DISCUSSION

### A. *Statement of Facts*

Because this appeal follows the sustaining of a demurrer, we accept as true all properly pleaded material facts in the complaint. (*Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116, 1120 [100 Cal.Rptr.2d 246] (*Kotlar*); *Ramirez v. USAA Casualty Ins. Co.* (1991) 234 Cal.App.3d 391, 397 [285 Cal.Rptr. 757].) The facts, as alleged in the FAC, are as follows: On December 2, 1999, Coast issued a one-year automobile insurance policy to Mackey. The "policy period" was to run from December 2, 1999, until December 2, 2000. The "total premium" for this one-year period was $1,626.

At the time the policy was issued, Coast mailed to Mackey a "Premium Billing Notice and Notice of Cancellation If Not Paid" (the December Notice). The December Notice was a computer-generated document outlining the series of monthly payments and their due dates necessary to maintain the policy in force for the full year. The December Notice warned Mackey that he should "send [his] payment on time to avoid cancellation of [his] policy for non-payment of the premium." The December Notice also stated, "We urge you to send your payment in a timely manner, as there is no grace period for your payment." Mackey made the January 2000 payment, although it was late.

On January 21, 2000, Coast mailed a "Premium Billing Notice and Notice of Cancellation If Not Paid" (the January Notice). The January Notice stated that Mackey's "next payment in the amount of $151.50 is due by 02/02/00."[3] The January Notice further indicated that there was no grace period and that the policy would be canceled on February 3, 2000, if payment was not received by that date. Prominently displayed in the January Notice is the following language: "Please send your payment on time to avoid cancellation of your policy for non-payment of the premium. We value your business and urge you to send your payment in a timely manner, as there is no grace period for your payment. If unpaid, cancellation will be effective 02/03/00 at 12:01 a.m. Pacific Time (or sooner for other valid reasons). This is the only notice you will receive."

---

[3] The amount of $151.50 represented Mackey's usual payment of $146.50 plus a $5 late fee.

The January Notice further instructed Mackey to "[p]ay the exact amount of your payment on or before your due date to keep your policy in full force with no lapse in coverage." The January Notice showed that no premium was past due when it was sent on January 21, 2000, 13 days before the February payment was due.

Mackey admits that he received the January Notice. He also admits that he did not pay his premium by February 2, 2000, the day it was due. On February 3, 2000, Coast canceled the policy for nonpayment of the premium. No additional notice of cancellation was mailed to, or received by, Mackey. Mackey was involved in an automobile accident on February 17, 2000. On February 18, 2000, Mackey paid his premium. Coast denied coverage for claims arising out Mackey's February 17 accident because, at the time of the accident, his policy had been cancelled.

Mackey's FAC was brought as a class action, although a class has never been certified.[4] He alleged that Coast improperly canceled his policy in violation of the policy and governing statutes and that Coast improperly failed to provide coverage for the February 17 accident. The FAC alleged: "Plaintiff's policy was cancelled effective February 2, 2000 [*sic*[5]] for non-payment of premium based upon the notice dated January 21, 2000 when the payment was not actually due until February 2, 2000 . . . ." Among other things, Mackey's FAC sought a declaration that Coast was required to furnish coverage to Mackey under the terms of his automobile insurance policy with respect to the February 17 accident. Based on these allegations, he asserted causes of action for breach of contract, declaratory relief, unfair business practices, and breach of the covenant of good faith and fair dealing.

Mackey also alleged that he had entered into a premium financing agreement with respondent Bristol West to purchase the Coast automobile policy. He claimed Bristol West failed to disclose and improperly collected finance charges and installment fees on "retail installment contracts" in violation of the Unruh Act. Mackey alleged that he was entitled to recover these charges and fees and that statutory penalties should be imposed. In addition to the alleged violation of the Unruh Act, Mackey incorporated these factual allegations into causes of action for money had and received, unjust enrichment, and unfair business practices.

Additionally, Mackey's FAC advanced theories of liability based upon notices of cancellation delivered by Coast to third parties—the lienholder on

---

[4]Because the court never decided the issue of class certification prior to granting Coast's demurrer, we omit any discussion of the complaint's allegations with respect to the class Mackey seeks to represent.

[5]Mackey's policy was actually canceled on February 3, 2000.

his vehicle and persons who purchased "prima" policies from Coast. In this regard, Mackey alleged that on February 8, 2000—after Mackey's policy had been terminated for nonpayment of premium—Coast mailed Tech Credit Union, the lienholder on his vehicle, a "Notice of Cancellation or Nonrenewal—Lienholder Notice." Mackey alleged that Coast had an obligation under the language of the policy to cancel the lienholder's interest at the same time it canceled his interest. Instead, Coast "cancelled [his] policy for non-payment of premium prior to the time he was involved in an accident on February 17, 2000 although the lien holder of [his] policy had until February 20, 2000 to make such payment." Based on these allegations, Mackey sought declaratory relief, and alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair business practices.

Lastly, Mackey alleged that Coast provided some of its policyholders, those holding "prima" policies, with a 15-day grace period if they failed to make a timely payment of their insurance premium. Mackey alleged that providing a grace period for prima plan insureds but not for other insureds, like himself, constituted a breach of the implied covenant of good faith and fair dealing. He also relied on this theory of liability to support his causes of action for unfair business practices, money had and received, and unjust enrichment.

Coast demurred to the FAC, contending that it failed to state facts sufficient to constitute the causes of action pled. Coast argued that none of Mackey's causes of action based on the alleged improper cancellation of his insurance policy had merit because the policy was properly terminated or canceled before the date of the accident involving Mackey. Coast argued that both the policy and the Insurance Code authorized cancellation for nonpayment of premium so long as at least 10 days' notice was provided. Coast emphasized that Mackey admitted that he received the January Notice 13 days before the cancellation was effective. Although he received the notice, Mackey admitted that he paid the premium 16 days after it was due and 1 day after he was involved in an accident. Under these facts, Coast argued the cancellation was authorized under both the policy and the Insurance Code.

Coast further argued that Mackey's causes of action based on the claimed violation of the Unruh Act were equally without legal support. In this regard, Coast contended that Mackey could not establish the existence of any "retail installment sale," and therefore, the credit disclosure requirements of the Unruh Act did not apply. In addressing Mackey's alternative theories of liability, Coast contended there was nothing in the automobile insurance policy or the Insurance Code that would require Mackey and the lienholder

to receive the notice of cancellation at the same time. Moreover, Coast argued that Mackey could not claim the rights of Coast policyholders holding "prima" policies and that nothing prohibited Coast "from giving ['prima'] policyholders rights over and above the statutory minimums stated in the Insurance Code."

On September 27, 2001, the court granted Coast's demurrer to Mackey's FAC without leave to amend, and on December 7, 2001, the action was dismissed in its entirety with prejudice. This appeal followed.

B. *Standard of Review*

■ "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Our review also requires us to interpret the meaning of the relevant provisions of the California Insurance Code. ■ In doing so, we apply a fundamental rule of statutory construction: "[A] statute 'must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity.' [Citations.]" (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 299 [91 Cal.Rptr.2d 479].)

C. *General Overview of the Law Governing Cancellation of Mackey's Automobile Insurance Policy*

■ The principal question presented by this case is whether an insurer's attempted cancellation of an automobile insurance policy was ineffective because the notice provided was procedurally defective, regardless of

whether the insurer acted upon a valid ground for canceling the policy. As we discuss below, such a claim is made possible by the rule in California that notices of cancellation must strictly comply with statutory directives and the insurance policy's termination provisions.

■ In California, there is no such thing as substantial compliance in furnishing notice that an insurance policy has been cancelled. (See generally *Lee v. Industrial Indemnity Co.* (1986) 177 Cal.App.3d 921, 924-925 [223 Cal.Rptr. 254] (*Lee*).) Termination of coverage can only be accomplished by strict compliance with the terms of any statutory provisions applicable to cancellation. (*Kotlar, supra,* 83 Cal.App.4th at pp. 1120-1121; *Lee, supra,* 177 Cal.App.3d at p. 924.) Likewise, the insurer must adhere closely to all policy provisions setting forth requirements as to the time and manner of giving notice of cancellation to the insured. (*Naify v. Pacific Indemnity Co.* (1938) 11 Cal.2d 5, 10 [76 P.2d 663, 115 A.L.R. 476]; *Lee, supra,* 177 Cal.App.3d at pp. 924-925.) "*If a cancellation is defective, the policy remains in effect even if the premiums are not paid.* [Citation.]" (*Kotlar, supra,* 83 Cal.App.4th at p. 1121 (italics added); *National Auto. & Casualty Ins. Co. v. California Casualty Ins. Co.* (1983) 139 Cal.App.3d 336, 341 [188 Cal.Rptr. 670].)

■ Statutes governing automobile insurance invariably contain provisions requiring that notice of cancellation by the insurer be given to the insured in advance of the effective date of the termination of coverage. ■■■ These provisions are usually quite specific as to the amount of time an insurer must allow between the giving of notice and the effective date of cancellation, and it is not uncommon for different time periods to be prescribed depending on such factors as the reason for the cancellation.[6]

■ Section 661, subdivision (a)(1), provides that an insurer may issue a notice of cancellation of an automobile insurance policy because of the

---

[6]We reject parenthetically Coast's contention that its policy language and section 668.5 gave Coast an unfettered right to cancel Mackey's policy anytime within the first 60 days of Mackey's policy. Formerly, section 661, subdivision (b), granted insurers an unrestricted right to cancel a policy during the first 60-day period, and under section 668.5, cancellation in the first 60 days of the policy could be accomplished simply by giving the insured 10 days notice without stating any reason. However, section 1861.03, subdivision (c)(1), added as part of Proposition 103 in 1988, provides that, "[n]*otwithstanding any other provision of law,*" insurers may not cancel automobile insurance policies except for nonpayment of premiums, fraud, or a significant increase in the hazard insured against. (Italics added; *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 831 [258 Cal.Rptr. 161, 771 P.2d 1247] [upholding constitutionality of Prop. 103].) *Calfarm* explains: "The only effect of Proposition 103 upon this section was to eliminate the 60-day grace period following issuance of a policy during which section 661 placed no limits on cancellation." (*Id.* at p. 826, fn. 19.) Thus, the clear intent of section 1861.03, subdivision (c)(1), was to eliminate the statutory distinctions created for policies in effect for less than 60 days.

insured's nonpayment of premium. "Nonpayment of premium" is defined in section 660, subdivision (f), as the "failure of the named insured to discharge *when due* any of his obligations in connection with the payment of premiums on a policy, or any installment of such premium, whether the premium is payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit." (Italics added.) ▮ ▬▬ Section 662, which contains the legislative mandate concerning the amount of advance notice that must be furnished by the insurer in order for a cancellation for nonpayment of premium to be effective, states as follows: "No notice of cancellation of a policy to which Section 661 applies shall be effective unless mailed or delivered by the insurer to the named insured, lienholder, or additional interest *at least 20 days prior to the effective date of cancellation; provided, however, that where cancellation is for nonpayment of premium, at least 10 days' notice of cancellation* . . . accompanied by the reason therefor . . . . [¶] This section shall not apply to nonrenewal." (Italics added.)[7]

## D. *Legislative Intent—At Least 10 Days' Notice of Cancellation*

▮ The pivotal question is whether an insurer can fulfill the 10-day notice of cancellation for nonpayment of premium requirement of section 662 by sending notice to its insured prior to the date on which the premium, or any installment thereof, is due. Although this question appears to be one of first impression in California, there is a substantial body of out-of-state cases deciding exactly this question under comparable statutes.[8]

Mackey argues that the correct result in this case can be reached by simply applying the principle that ambiguities in insurance policies are resolved

---

[7]Statutory provisions requiring notice are deemed incorporated into the insurance policy. (See generally *Empire Fire & Marine Ins. Co. v. Bell* (1997) 55 Cal.App.4th 1410, 1420 [64 Cal.Rptr.2d 749].) The policy language in this case substantially conforms to the applicable statutory requirements.

[8]The bulk of relevant legal authority, and the authority we find persuasive, holds that a notice of cancellation, sent before a premium is actually due, is not sufficient to effect a cancellation for nonpayment of premium. (See *Travelers Insurance Company v. Jenkins* (La.Ct.App. 1973) 285 So.2d 839, 844; *Automobile Club Ins. Co. v. Donovan* (R.I. 1988) 550 A.2d 622, 623-624; *Pennsylvania Nat. Mut. Cas. Ins. v. Person* (1982) 164 Ga.App. 488 [297 S.E.2d 80, 82]; *Hart v. MFA Ins. Co.* (1980) 268 Ark. 857 [597 S.W.2d 105, 107-109]; *Dairyland Ins. Co. v. Neuman* (Minn. 1983) 338 N.W.2d 37, 41; *Fisher v. Associated Underwriters* (1938) 294 Ill.App. 315 [3 N.E.2d 809, 811]; *Mitchell v. Burnett* (1971) 1 Ill.App.3d 24 [272 N.E.2d 393, 396-397]; *Conn v. Motorist Mut. Ins. Co.* (1993) 190 W.Va. 553 [439 S.E.2d 418, 421-423]; *Priest v. Bankers' Life Ass'n* (1916) 99 Kan. 295 [161 P. 631, 634].) Against this spectrum of authority Coast cites *Munoz v. New Jersey Auto. Full Ins. Underwriting* (1996) 145 N.J. 377 [678 A.2d 1051] (*Munoz*), a divided decision which stands relatively alone in concluding that the notice of cancellation of an insurance policy for nonpayment of premium need not postdate the insured's default in payment. However, we find the majority opinion in *Munoz* to be less persuasive than the dissent.

against the drafter, usually the insurer, and generally in accordance with the insured's reasonable expectations. (See, e.g., *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 762-763 [110 Cal.Rptr.2d 844, 28 P.3d 889]; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) He argues that "[a] reasonable insured would interpret [the policy's cancellation] provision to mean that if a premium was not paid when due, a cancellation notice could be based on than [*sic*] nonpayment, but not upon the anticipation of nonpayment." However, the aforementioned principles do not govern here because the question arises not under an insurance policy drawn by an insurer, but under a statute, composed by the Legislature.

■ Our Supreme Court in *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674 [274 Cal.Rptr. 387, 798 P.2d 1230] directed that where an insurance policy provision is authorized by statute it should *not* be construed strictly against the insurer, but instead is to be deemed consistent with public policy and must be construed to implement legislative intent. (*Id.* at p. 684; accord, *Jacobs v. Fire Ins. Exchange* (1991) 227 Cal.App.3d 584, 590 [278 Cal.Rptr. 52].) In other words, language required by statute in an insurance policy must be construed to effect not the intent of the parties but the intent of the Legislature. (See *Prudential-LMI Com. Insurance v. Superior Court, supra*, at p. 684.) ■ Therefore, to reach the proper result in this case, the rules of statutory construction apply. (See, e.g., *State Farm Mut. Auto. Ins. Co. v. Messinger* (1991) 232 Cal.App.3d 508, 519-520 [283 Cal.Rptr. 493]; *Interinsurance Exchange v. Marquez* (1981) 116 Cal.App.3d 652, 656 [172 Cal.Rptr. 263].)

■ Familiar rules of statutory interpretation guide our task. " 'Words used in a statute . . . should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' [Citation.] If the language permits more than one reasonable interpretation, however, the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citations.] After considering these extrinsic aids, we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977-978 [90 Cal.Rptr.2d 260, 987 P.2d 727].)

■ In analyzing the words used in section 662, Coast argues that the insurer's selection of an effective date for the termination of coverage is

limited only by the requirement that at least 10 days' advance notice of cancellation be given. Coast insists that nothing in the express language of section 662 mandates that the 10-day period commence *after* the insured fails to pay the premium. Coast also claims its interpretation of section 662 finds support in an "Automobile Insurance Consumer Information Guide" published by the California Department of Insurance. Finally, Coast argues it cannot be against public policy for an insurer to issue a notice of cancellation for nonpayment of premium before the point in time the payments actually become delinquent. Any other construction, it warns, would afford a defaulting insured 10 days of free insurance for the period between the default and the effective date of cancellation, which could not have been the intent of the Legislature when it passed section 662.

We agree with Coast that on the key issue before us—gauging the timing of the transmittal of the notice of cancellation to the insured—the language of section 662, when considered alone, is silent. However we believe the statutory context of section 662 yields an expression of legislative intent and guides us in its proper interpretation. The phrase "nonpayment of premium" as used in section 662 is statutorily defined at section 660, subdivision (f) as the "failure of the named insured to discharge *when due* any of his obligations in connection with the payment of premiums on a policy, or any installment of such premium, whether the premium is payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit." (Italics added.)

Therefore, under California law, an insurance policy may be cancelled by the insurer for failure of the named insured to discharge "when due" any of his or her obligations in connection with the payment of premiums for the policy. (§ 660, subd. (f).) Where cancellation of the policy is for failure of the named insured to pay a premium "when due," no less than 10 days' written notice of cancellation to the insured is required by section 662. However, in the instant case, the notice of cancellation was not given to Mackey upon his failure to pay the premium "when due." Instead, the notice of cancellation for "nonpayment of premium" was sent 13 days before the premium was due, and purported to cancel the policy 1 day after the due date.

The obvious purpose of providing strict time limits for advance notice as a prerequisite to cancellation of an automobile insurance policy is to protect the insured against unintended termination of coverage caused by the inadvertent delay of a premium payment, and thus, to give the defaulting policyholder at least a 10-day period to cure the default or secure other insurance. (See generally *Kotlar, supra,* 83 Cal.App.4th at p. 1122; *National*

*Auto. & Casualty Ins. Co. v. California Casualty Ins. Co., supra,* 139 Cal.App.3d 336, 340-341 [188 Cal.Rptr. 670] ["Public policy certainly favors a system under which motorists will not be operating their vehicles without the benefit of public liability coverage"].)

Coast's construction of the statute ignores this purpose. It suggests that insurers have the unilateral right to select when notices of cancellation are sent, subject only to the requirement that at least 10 days' advance notice be given. Any notice sent more than 10 days prior to the premium due date would meet the requirements of the statute. But under this view, the statutory notice could be given 10 weeks or even 10 months before the premiums are due. In fact, Coast would argue that an insurance company could fulfill its obligation under section 662 by sending one notice, such as Coast's December Notice, indicating the date that 11 separate future premium payments will become due, and warning that the policy will be cancelled if any future payment is not received by its due date.

This cannot have been what the Legislature had in mind when it passed section 662. Receipt of a notice of cancellation of automobile insurance should be an unanticipated event; something that spurs the insured into action to protect against the potentially catastrophic consequences associated with being an uninsured motorist—not something that is received routinely with each month's bill.[9] As pointed out by the dissenting judge in *Munoz,* "a premature notice of cancellation for non-payment would not serve its intended function of informing an insured that his or her coverage was in danger of lapsing when the insured had no intention of defaulting, but, because of a bounced check or some other unexpected, post-notice event, fails to pay on time." (*Munoz, supra,* 678 A.2d at pp. 1058-1059 (dis. opn. of Stein, J.).)

Furthermore we are not persuaded by Coast's reference to an informal interpretation of section 662 contained in the Automobile Insurance Consumer Information Guide published by the California Department of Insurance. In pertinent part, it explains: *"The California Insurance Code requires*

---

[9]A related statute clearly contemplates that a notice of cancellation should not be sent as a routine matter before there is any default in payment. Section 11624, subdivision (e), governing the contents of assigned risk plans, provides: "The plan shall include procedures for notifying within a reasonable time the agent, broker, or solicitor who obtained insurance under the plan for the insured of any nonpayment of premium to the insurer when notice of the nonpayment is sent to the insured pursuant to Section 662." One could reasonably query why section 11624, in such a straightforward fashion, directs that additional parties should be notified in case a "notice of the nonpayment is sent to the insured pursuant to Section 662" if indeed the Legislature intended such notices would be sent out routinely before there was actually a failure to make a payment.

*10 days notice before an insurance company can cancel an automobile policy for non-payment of premium. However, the notice need only be a previous statement with the cancellation date on it. For example, if you are on a premium installment plan, the insurance company can satisfy their notice requirement by mailing the premium payment bill 10 days before it is due with the cancellation date clearly stated. It is important to know that the California Insurance Code does <u>not</u> give a grace period for non-payment of premium. . . .*" (Original italics and underscoring.)

■ First, while statutory interpretations offered by the Department of Insurance are to be respected, in the final analysis, the interpretation of the provision at issue here remains a question of law solely within the province of this court. (*CD Investment Co. v. California Ins. Guarantee Assn.* (2000) 84 Cal.App.4th 1410, 1418 [101 Cal.Rptr.2d 806].) Moreover, the level of deference due an agency's construction of a statute turns on a legally informed, common-sense assessment of such factors as " 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . .' [Citation.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14-15 [78 Cal.Rptr.2d 1, 960 P.2d 1031], italics omitted; *Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 524 [106 Cal.Rptr.2d 548, 22 P.3d 324].)

■ In applying the foregoing factors, we note that the single paragraph in question contained in the informational booklet was not adopted with the formalities of "an administrative regulation which might be subject to the notice and hearing requirements of proper administrative procedure. [Citation.]" (*Jones v. Tracy School Dist.* (1980) 27 Cal.3d 99, 107 [165 Cal.Rptr. 100, 611 P.2d 441].) Nor does it evince any consideration of the statutory language, the context of other statutory provisions dealing with notices of cancellation, or the legislative intent behind section 662. As such, the usual deference given to a formal agency interpretation of a statute is inappropriate, and we therefore conclude the Department of Insurance's interpretation of section 662 contained in the Automobile Insurance Consumer Information Guide is entitled to minimal deference.

Finally, Coast argues that it would be financially unfair to require notices of cancellation to postdate payment defaults. This argument implicitly assumes a "grace period" of free insurance would be given to insureds who fail to make their premium payments on time. However, this same argument was made and rejected in *Munoz*. As the majority of that court conceded, "the problem of free insurance where a notice post-dates default can be minimized by proper scheduling on the part of insurance companies." (*Munoz,*

*supra*, 678 A.2d at p. 1057.) It then offered the following solution to the "free insurance" problem, using the 15-day notice period required in New Jersey: "If a policyholder's initial premium payment, pro rated on a per diem basis, provides coverage through May 30, for instance, an insurer can choose to set the second premium due date at May 15. In such a situation, the policyholder has already paid for the fifteen days that comprise the statutory notice period in the event that he or she defaults. If during the course of the policy the insured's carry date moves forward to May 15 due to a change in coverage, we see no reason why the insurer cannot at that point adjust the premium due date to May 1 or require an additional premium payment at the time of the change in coverage that will carry the policyholder to the same date as under the previous policy. The proposed solution remedies the free insurance problem." (*Ibid.*) Not only do we agree with this analysis, but point out additionally the fact that Coast offers a "prima" policy, which provides for a grace period *after* default, shows that insurance premiums can be adjusted to allow for California's 10-day notice period.

Coast also attempts to blur the important distinction between "cancellation" and "expiration." For example, Coast points to section 663, which provides that at least 20 days prior to policy expiration, an insurer must deliver or mail to the named insured an offer of renewal of the policy contingent upon payment of premium as stated in the offer. Under this statute, the failure of an insured to pay the premium on or before the date specified in the renewal offer will result in an automatic termination of the policy and no further notice of cancellation under section 662 is required. (*Kates v. Workmen's Auto Ins. Co.* (1996) 45 Cal.App.4th 494, 507 [52 Cal.Rptr.2d 852] (*Kates*).)

Thus, Coast attempts to bring this case within the purview of the aforementioned rule by arguing that Mackey's policy *expired*, as opposed to being *cancelled*, when Mackey failed to pay his premium on February 2, 2000. Coast claims that its December Notice, which was mailed over 20 days prior to Mackey's coverage being terminated, was actually a renewal offer in accordance with section 663, "even though it does not include the terms 'renew' or 'expire.'" Therefore, since Mackey failed to pay the February premium by the due date as provided in the December Notice, the policy simply expired, and no further notice of cancellation was required.

Cancellation is the termination of coverage, with or without cause, by unilateral action of the insurer before its expiration date. (*Calfarm Ins. Co. v. Deukmejian, supra*, 48 Cal.3d at p. 826, fn. 19; see § 660, subd. (g).) Expiration is the cessation of coverage by reason of passage of the policy period or the occurrence of some event anticipated by the terms of the

contract. (See § 660, subd. (i).) Here, as numerous documents attest, Mackey's automobile insurance policy was issued on December 2, 1999, and it covered Mackey for a one-year policy period expiring on December 2, 2000. This case involves cancellation on February 3, 2000 (2 months into the policy period and 10 months before the policy's expiration date) by the unilateral action of the insurer for failure of the insured to pay his premium when due. This is not a case where the policy expired by its own terms because the insured failed to pay the renewal premium at the end of the policy period. Consequently, for Coast to discontinue coverage at this point in time, it was required to comply strictly with the procedures set forth in section 662 governing policy cancellation for nonpayment of premium.

Nothing in *Kates, supra,* 45 Cal.App.4th 494, changes our analysis. While *Kates* provides clarity concerning the relationship between nonpayment of premiums and expiration of policies, we find that it sheds no light on the question before us, which involves policy cancellation. In a nutshell, *Kates* held that an insurer, having given notice of willingness to renew upon payment of the premium, is under no obligation to issue a notice of cancellation under section 662 when the payment is not made and the policy expires according to its fixed expiration date. In *Kates,* the policy was not canceled by anyone prior to the accident—it simply lapsed because of the insured's failure to accept the offer to renew by making the payment within the time allowed. As we have already emphasized, in our case, Mackey's policy was canceled before the end of the policy term for nonpayment of premium. We do not think the *Kates* court intended to obliterate the distinctions between "cancellation" and "expiration." In fact, the contrast between these terms is brought into sharp focus by the following passage from *Kates*: "It is evident that sections 661 [grounds for valid notice of cancellation] and 662 [requirements for transmittal of notice of cancellation to insured] do not apply to expiration of a policy for nonpayment of premiums." (*Kates,* at p. 500, fn. 1.) Therefore, any broad language in *Kates* regarding nonpayment of premium and continuation of coverage was written in the context of policy expiration and renewal and therefore is, at best, tangential to the outcome of this case.

In conclusion, when section 662 is read together with the statutory definition of "nonpayment of premium" and the matter is considered in light of the legislative intent, there is but one obvious, reasonable interpretation of section 662. It is apparent that the Legislature intended to provide policy-holders with a 10-day period *after default* before the insurer can effectively cancel the policy. This additional notice was intended to provide policyholders who default in payment of their premium an opportunity during the 10-day period to pay the past due premium and keep the policy in force or to

secure other insurance. Accordingly, the notice of cancellation for "nonpayment of premium" issued at a point in time when Mackey had not failed to discharge his premium payment obligation was invalid and unenforceable and violated section 662 as construed above. Therefore, we find the trial court erred in sustaining Coast's demurrer to the causes of action in Mackey's FAC based on the improper notice of cancellation of his automobile insurance policy.

E. *Cancellation Notice Given to Lienholder*

In his FAC, Mackey alleges that Coast acted "unreasonably and arbitrarily" by "canceling policies of plaintiff and the class when lienholders were given a cancellation date of at least ten days later than the cancellation date provided to plaintiff . . . ." Mackey points out that the premium billing notice he received stated that a payment had to be made by February 2, 2000, or the policy would be canceled effective February 3, 2000. By contrast, the lienholder cancellation notice sent to Tech Credit Union, the lienholder on his vehicle, was dated February 8, 2000, after the policy had already been canceled as to Mackey. And while Mackey was given until February 2, 2000 to make the payment, the lienholder was given until February 20, 2000, to make the payment. Consequently, "[t]he lienholder was given a 'grace period' while the insured was not" and the insurance policy was in effect for the lienholder on the date of the accident.

By way of background, the agreement between the lienholder and the property owner usually requires the property owner to obtain insurance protecting the lienholder's interest so long as the secured debt remains outstanding. "This is usually done through an endorsement to the property owner's insurance making the lienholder the 'loss payee' to the extent of its interest in the property." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 6:215, p. 6B-6.) That way, "[i]n the event the vehicle is 'totaled' or stolen, the policy usually requires payment to lienholders (to the extent of their liens) *before* any payment to 'owners.'" (*Id.* at ¶ 6:2010, p. 6G-2, original italics.)

As we understand it, Mackey's argument is that the policy could not be terminated as to him because it remained in effect for the lienholder, who was sent the cancellation notice at a later time. In *Savarese v. State Farm etc. Ins. Co.* (1957) 150 Cal.App.2d 518, 522 [310 P.2d 142], this division dealt with a substantially similar issue as follows: "Cancellation of the policy as to [named insured/owner] was specified to be effective at 12:01 a.m., June 15, whereas the notice to the lienholder merely stated the date, and not the hour, of cancellation. The result is that the policy remained in effect as to the

lienholder after its cancellation as to the owner. . . . Appellant contends that the policy cannot be cancelled as to the owner so long as it remains in effect as to the lienholder. But the courts have treated the rights of the owner and the 'loss payee' as independent [citations]." *Savarese* expresses the prevailing rule that the protected interests and notice requirements of the named insured and lienholder are separate and a policy can be canceled as to one but remain in effect as to the other. (See *Pacific Ins. Co. v. Kent* (C.D.Cal. 2000) 120 F.Supp.2d 1205, 1216; *Home Savings of America v. Continental Ins. Co.* (2001) 87 Cal.App.4th 835, 848 [104 Cal.Rptr.2d 790].) We see no reason to depart from this rule.

Both the Insurance Code and the terms of Mackey's automobile liability policy confirm the unique and independent nature of the obligation Coast assumed to the loss payee and to its named insured. Sections 661 and 662 set out the general principle that a policy of insurance can be canceled for nonpayment of premium by a timely notice of cancellation to the "named insured, lienholder *or* additional interest" covered by the policy. Because section 662 uses the disjunctive word "or," the statute indicates that each of the three entities has a separate insurable interest. The Insurance Code continues the disjunctive pattern. Section 662.1 governs how delivery of the appropriate notice to a "lienholder *or* an additional interest on a policy" is proved. (Italics added.) Section 664 governs how delivery of the appropriate notice to the "named insured" is proved. Each interest is covered in a different section.

Mackey's automobile insurance policy also recognizes the separate interests of the loss payee and the insured. A totally distinct portion of the policy entitled "Loss Payable Clause" covers the rights of the loss payee. The loss payable clause provides that "[l]oss or damage under this policy shall be paid as interest may appear to [the named insured] and the loss payee shown in the Declarations." It further states that, "We will not pay the loss payee more than the loss payee's financial interest as represented by the net balance of the loan on the covered auto, subject to the limit of liability on this policy, less [the named insured's] deductible." It has been held that the loss payable clause creates a separate contract of insurance between the insurer and the loss payee. The consideration given by the loss payee is the promise to pay premiums on demand. (See *Home Savings of America v. Continental Ins. Co., supra,* 87 Cal.App.4th at p. 842.)

Nonetheless, Mackey asserts that the language of the loss payable clause in his insurance policy contains a sentence that distinguishes it from these authorities, and is at the heart of his theory of liability. Under his loss payable clause, the insurer "reserve[s] the right to cancel the policy as

permitted by the policy terms and the cancellation shall terminate the policy and this agreement as to the loss payee's interest. *We will give the same advance notice of cancellation to the loss payee as we give to the named insured shown in the Declarations.*" (Italics added.) In opposing demurrer, Mackey argued he "did not receive the same notice of cancellation given to the lienholder on his policy . . . . He was entitled to the same notice based upon the terms of the policy."

We disagree with Mackey's interpretation of the clause in the loss payee's separate contract with the insurer. The loss payable provision guarantees that the loss payee will receive the "same advance notice of cancellation" given to the insured. It does not require that the loss payee receive the "identical" notice mailed "at the same time." It is apparent that this policy language was structured to implement the requirements of section 662.1. That section provides: "Proof of mailing or delivery of a notice of cancellation to a lienholder or an additional interest on a policy to which this chapter applies shall be sufficient to terminate the interest of the parties provided the notice is *mailed or delivered at least the maximum number of days prior to termination of the parties' interest as required by Section 662.* . . . No lienholder or additional interest shall require a more restrictive form of notice." (Italics added.)

Thus, Mackey's insurance policy contains a loss payable clause which tracks the statutory notice requirement in section 662.1 by requiring Coast to give at least 10 days' notice to the loss payee prior to the cancellation of the loss payee's protection. Exhibit G to the FAC confirms that Coast provided Tech Credit Union, Mackey's loss payee, at least the same number of days of advance notice of cancellation provided to Mackey—10 days—before terminating the loss payee's interest. The demurrer, therefore, was properly sustained as to the allegations in the FAC regarding the notice of cancellation given the loss payee on Mackey's vehicle.

F. *Cancellation Notice Given to Prima Policyholders*

 Mackey's FAC also alleged that Coast provided a policy called a "prima plan" which used the same policy form but provided that policy cancellation would not take place until at least 15 days after the policy payment was due. Mackey acknowledges that the financial terms governing the "prima plan" were different than the financial terms governing his policy.[10] Mackey contends that "Coast National's disparate practices in using the same policy form and providing a grace period for prima plan

---

[10]The financial differences between the prima plan and the plan Mackey purchased were set out as follows: "The down payment under the prima plan was 12.5 percent rather than 8.33

insureds and not for plaintiff constitutes unfair discrimination" as alleged in his first amended complaint.

Coast cannot be charged with "unfair discrimination" by offering different types of policies containing different terms to its policyholders, untethered to any allegation that commercial distinctions were based on suspect class membership. (See § 11628 ["[N]or shall race, language, color, religion, national origin, ancestry, or location within a geographic area of itself constitute a condition of risk for which a higher rate, premium, or charge may be required of the insured for that insurance."]; see generally Williams, *The Constitution and the Economically Disadvantaged, "The Wrong Side of the Tracks": Territorial Rating and the Setting of Automobile Liability Insurance Rates in California* (1992) 19 Hastings Const. L.Q. 845.)

Moreover, this is a case like *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730], where the administrative remedies available under the Insurance Code have yet to be invoked. (See § 1858 et seq. [setting out procedures for administrative determination of rate and ratemaking issues].) In considering a cause of action similar to the one alleged by Mackey, our high court stated: "In practice, resolution of the 'unfairly discriminatory rate' question will turn in many instances on determination of the . . . rate-setting provisions of the Insurance Code. It is readily apparent that a court would benefit immensely, and uniformity of decisions would be greatly enhanced, by having an expert administrative analysis available before attempting to grapple with such a potentially broad-ranging and technical question of insurance law." (*Farmers Ins. Exchange*, at pp. 399-400, fn. omitted.)

The record before us establishes that Mackey has not stated a cause of action in this regard against Coast, and cannot amend the FAC to do so. A demurrer can be properly sustained to the existing complaint without further amendment "where 'the facts are not in dispute, and the nature of the plaintiff's claim is clear, but, under the substantive law, no liability exists. Obviously no amendment would change the result.' (5 Witkin, [Cal. Procedure (3d ed. 1985) Pleading], § 945, p. 379.)" (*Seidler v. Municipal Court* (1993) 12 Cal.App.4th 1229, 1233 [16 Cal.Rptr.2d 90].) Accordingly, the court did not err by sustaining Coast's demurrer to the causes of action based on the rates and terms of Coast's "prima plan."

---

percent and the balance was paid in ten monthly payments rather than eleven payments. . . . The installment fee under this plan was $60.00 or $6.00 per installment rather than the $132.00 or $12.00 per installment charged under the plan purchased by plaintiff."

### G. *Claims Under the Unruh Act*

Mackey's FAC also involves different claims based on the premium financing agreement Mackey entered into with Bristol West in order to purchase the Coast automobile insurance policy.[11] These claims allege the purported violation of the disclosure requirements of the Unruh Act. They are then incorporated into causes of action for money had and received, unjust enrichment, and unfair business practices.

"The Unruh Act was enacted to correct abuses incident to the growth of the consumer credit industry. [Citation.] The act proscribes a variety of unfair practices and requires complete disclosure to the consumer of the total cost for the purchase of goods and services under a retail installment contract." (*Crawford v. Farmers Group, Inc.* (1984) 160 Cal.App.3d 1164, 1168 [207 Cal.Rptr. 155] (*Crawford*).) The act covers a retail installment sale, meaning "the sale of goods or the furnishing of services by a retail seller to a retail buyer, for a deferred payment price payable in installments." (Civ. Code, § 1802.5.)

In *Crawford*, *supra*, 160 Cal.App.3d 1164, a claim based on the Unruh Act was dismissed because "the purchase of the monthly insurance policy was not a credit sale within the meaning of the Unruh Act." (*Id.* at p. 1169.) *Crawford* involved an automobile insurance policy payment plan, under which the premium was calculated on a six-month term and the insured paid it in six monthly installments of $46.08, plus a monthly service fee of $2.50. (*Id.* at p. 1167.) The court held that this arrangement did not constitute a consumer credit transaction subject to the disclosure requirements of the Unruh Act, where the purchaser did not contract to pay the total purchase price for the six-month period and could terminate the policy without further obligation at any time simply by not paying the next month's premium. (*Ibid.*) No debtor-creditor relationship was established, and therefore the Unruh Act did not govern the transaction. (*Ibid.*)

Mackey attempts to distinguish *Crawford* by relying on factual differences in the way the policy in *Crawford* was structured as compared to

---

[11]The purchase of the Mackey's automobile policy was financed through a premium-billing plan established by Bristol West. The total cost of the policy purchased by Mackey was $1,626. Plaintiff made an initial payment of $146.45, which paid for his first month of insurance coverage from December 2, 1999, through January 1, 2000. He was charged an installment fee of $132 for the privilege of making the remaining payments in 11 monthly installments. This $132 amount was included in the purchase price, making $1,758 the total cost of the insurance policy. The December Notice stated that the unpaid balance of $1,611.55 would be payable in 11 monthly installments, with the first 10 installments being $146.50. The first installment was due on January 1, 2000, and the 11th installment was due on November 1, 2000. A $5 late fee was charged if an installment was paid after it was due.

his policy. However, in reaching the conclusion that the Unruh Act did not apply, the *Crawford* court relied not only on the structure of the policy, but on the fact that the insured could terminate the policy "without further obligation to [the insurer] by not paying the next month's premium. Plaintiff owed no underlying obligation, and a creditor-debtor relationship did not arise." (*Crawford, supra*, 160 Cal.App.3d at p. 1169.)

We see no material difference between *Crawford* and the case before us. *Crawford* teaches that in the absence of any remaining balance or underlying debt, the purchase of a monthly insurance policy is not a credit sale within the meaning of the Unruh Act. In our case, Mackey's automobile insurance purchase plan provided one month of coverage for each month a premium was paid, without any obligation to pay or purchase beyond that month. Mackey has not and cannot allege that he was obligated to maintain the policy in effect throughout the policy period or to pay the entire one-year premium of $1,626. In fact, the policy includes no such requirements. Mackey was free to terminate the policy at any time without the obligation to pay further premiums.

Consequently, the purchase of insurance coverage under the monthly payment plan was not a credit transaction or a retail installment sale within the meaning of the Unruh Act. The trial court correctly concluded that Mackey's claims based on the Unruh Act could not be maintained and did not err in sustaining Coast's demurrer to these causes of action without leave to amend.

### III.

### DISPOSITION

We reverse the judgment dismissing the complaint on the ground that the trial court erred in sustaining the demurrer to the allegations in Mackey's FAC based on the improper notice of cancellation of his policy. In all other respects the judgment is affirmed and the matter is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

Kline, P. J., and Haerle, J., concurred.

Petitions for a rehearing were denied February 27, 2003, and respondents' petition for review by the Supreme Court was denied April 23, 2003. Kennard, J., and Brown, J., were of the opinion that the petition should be granted.