Filed 4/7/14  Smally v. Nationwide Ins. Co. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROY SMALLY, JR., et al.,<br><br>        Plaintiffs, Cross-defendants and Appellants,<br><br>v.<br><br>NATIONWIDE INSURANCE COMPANY,<br><br>        Defendant, Cross-defendant and Appellant;<br><br>MARIN MORTGAGE BANKERS CORPORATION,<br><br>        Defendant, Cross-complainant and Respondent. | A133533<br><br>(Marin County<br>Super. Ct. No. CV 095999) |

In this insurance bad faith action, Roy Smally, Jr., and Vivi Mitchell (the Smallys) appeal from the court's judgment determining that the jury verdict, awarding them damages for benefits owed under the policy, was duplicative of the damages awarded to the mortgagee of the Smallys' property, Marin Mortgage Bankers Corporation (MMB). They also challenge the court's order denying their motion for a new trial on their claim that Nationwide Insurance Company of America (Nationwide) was obligated to pay the cost of repairing their property.  Nationwide cross-appeals from the judgment of damages in favor of the Smallys and MMB and from the court's order awarding attorney fees. Nationwide argues that there is no substantial evidence to support the jury's verdict for breach of the policy or its verdict finding that Nationwide was liable for bad faith in its

handling of MMB's claim. Nationwide also argues that there is no substantial evidence to support the jury's punitive damages award to MMB nor the court's award of attorney fees to the Smallys and MMB. We reverse the amount of bad faith damages awarded to MMB, and modify the amount of the Smallys' attorney fees award. We remand the matter to the trial court for a recalculation of MMB's bad faith damages, and otherwise affirm the judgment.

## I. FACTUAL BACKGROUND[1]

On June 26, 2008, Mitchell met with her insurance agent and purchased a property insurance policy through Nationwide for the Smallys' rental property located at 1039 Georgia Street in Vallejo (the property) with a value of $345,000. Mitchell was concerned about the amount of the policy because the loan on the property was approximately $420,000, but the agent assured her that extended coverage would be provided once the adjuster evaluated the property. Mitchell made a payment on the policy using her checking account and received a 30-day binder. As required by the Smally's mortgage on the property, MMB was named as a mortgagee/lienholder under the policy. Accordingly, Nationwide issued a standard lenders loss payable endorsement. At the time Mitchell purchased the insurance, the Smallys operated Mary's Help, a residential treatment facility for juvenile offenders, at the property.

---

[1] Our review of this case was made extremely difficult due to the parties' failure to set forth a complete statement of facts supported by adequate citations to the record. The parties appear to have made their own rules concerning the requisite support for their respective statements of facts. Many of the statements of fact set forth in their briefs contain no citations to the record in contravention of the California Rules of Court. We remind counsel that the parties have a duty to provide adequate *record* citations including cites for *every* statement of fact. (Cal. Rules of Court, rule 8.204(a)(1)(C) ["Support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."]; see also *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205.) "It is not our place to comb the record seeking support for assertions parties fail to substantiate." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 534.)

On August 4, 2008, there was a fire at the property.[2] The Smallys made a claim under the policy. Nationwide informed them that the policy had been cancelled on July 18, 2008 due to nonpayment of the premium. Nationwide provided evidence that it sent the Smallys a letter on July 3, 2008, informing them that the policy would be cancelled because it had not yet received their premium payment. The letter noted that the Smallys' bank had not honored their check for the premium payment and Nationwide demanded a premium payment by July 18, 2008 in order to maintain the insurance policy. There was also evidence that an employee of the Smallys' insurance agency left phone messages that the Smallys' check had bounced. The Smallys, however, claimed that they never received Nationwide's cancellation notice.

On July 10, 2008, prior to the policy being cancelled, Nationwide's adjuster appraised the property and valued it at $461,000. Though Nationwide ordinarily would have increased the policy limits on the policy, it opted not to do so, reasoning that the policy was due to be cancelled.

On July 23, 2008, Nationwide notified MMB that the policy had been cancelled effective July 18, 2008.

Nationwide investigated the Smallys' claim under a reservation of rights. A Nationwide adjuster prepared a preliminary estimate of the cost to repair the property and estimated replacement cost at $362,368 and the actual cash value of the loss at $338,595.

On September 29, 2008, MMB made a claim under the policy for payment of its insured interest. MMB maintained that Nationwide failed to inform it that the policy had been cancelled as required by the policy's loss payable endorsement as well as by paragraph 15 of the policy.[3] It informed Nationwide that the amount owing on its loan to

---

[2] Five children were living at the property at the time; they and a counselor were able to exit the property safely.

[3] Paragraph 15 provided in part, "If the policy is cancelled by us, the mortgagee shall be notified at least 10 days before the date cancellation takes effect." It also contained a provision concerning subrogation rights: "If we pay the mortgagee for any loss and deny payment to you: [¶] a. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or [¶] b. at our option, we may pay to the

3

the Smallys as of September 30, 2008 was $480,088.08. Nationwide did not immediately respond to MMB's claim, and it delayed several months in providing MMB with a copy of the policy.

On December 9, 2008, Nationwide informed the Smallys that its claim for benefits under the policy was denied based on their failure to pay the premium and that Nationwide had given the Smallys the requisite notice under the policy.

In January 2009, Nationwide offered to pay MMB the policy limits under the policy. Specifically, Nationwide offered to pay $345,000, subject to the subrogation provision of the policy. In response, MMB stated that it was inclined to accept the offer but asserted that the offer would not fully compensate MMB for its rights under the policy and did not include payment for the garage or factor in inflation adjustments. On March 24, 2009, Nationwide insisted that under paragraph 15 of the policy it was entitled to pay off the entire mortgage and be subrogated to MMB's rights under the mortgage on the property. It also set forth its earlier agreement to pay the policy limits of $345,000.

MMB rejected the offer. On June 12, 2009, Nationwide, having obtained a new appraisal of the property, withdrew the offer, and offered to pay MMB $153,000, the actual cash value/fair market value of the improvements to the property. It contended that it was not liable to pay replacement cost unless the building on the property was actually replaced.

On June 24, 2009, Nationwide sent a proposed subrogation assignment agreement to MMB and indicated that a check in the amount of $153,000 as provided in the agreement would be forthcoming. MMB received the check but did not cash it.

On November 25, 2009, the Smallys filed a complaint against Nationwide, MMB, U.S. Bank, Fairfield Insurance Associates, Inc. (Fairfield), their insurance agent, and

_____

mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we shall receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt. [¶] Subrogation shall not impair the right of the mortgagee to recover the full amount of the mortgagee's claim."

Rick Knoss, a Fairfield employee.[4]  They alleged claims for reformation, breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation.  MMB, in turn, filed a cross-complaint against Nationwide and the Smallys for declaratory relief, and against Nationwide for breach of contract and breach of the covenant of good faith and fair dealing.

Trial commenced on March 4, 2011.  The Smallys contended that the policy was in force at the time of the fire and that Nationwide did not send a notice of cancellation to them or to MMB.  They argued that there was only a partial loss of the property and they were thus entitled to the cost of repairing the property, rather than the total loss and corresponding fair market value coverage proffered by Nationwide.  MMB argued that Nationwide breached the policy because it did not send the ten-day advance notice of cancellation as required by paragraph 15 of the policy.  In addition, it asserted that Nationwide acted in bad faith in its investigation by unreasonably delaying in responding to MMB's claim and refusing to pay undisputed coverage amounts.  MMB further urged that Nationwide concealed the policy from it, failed to notify it of the repair cost estimate, and misstated the policy limits.  Nationwide argued that the Smallys were not entitled to anything because the policy was cancelled, and that MMB was entitled to only the actual cash value — the fair market value of the property at the time of the loss or $153,000, since MMB did not repair or replace the damage to the property.

During deliberations, the jury sent questions to the court.  The jury first asked: "Does an improperly cancelled policy constitute a valid policy or does it constitute a cancelled policy?"  The court responded, "If the policy was not properly cancelled then it remains in effect.  If you have a more specific question, please let us know."  The jury's second question asked:  "Does the fact that Nationwide did not give [MMB] a ten-day

---

[4] The trial court granted Fairfield's motion for summary judgment.  The court found that "[t]he only reason that coverage was not in force on the date of the fire was because of [the Smallys'] failure to pay premiums, resulting in cancellation of the policy."  The court determined that the Smallys' arguments about Nationwide's failure to mail notice of cancellation of the policy were irrelevant as to Fairfield.  The Smallys do not challenge the court's summary judgment in favor of Fairfield.

5

advance Notice of Cancellation, on or around July 8, 2008, mean that the policy of the Smallys was not properly cancelled?" The court responded, "If a cancellation is defective, the policy remains in effect even if the premiums are not paid, and termination of coverage can be effectuated only upon strict compliance with the terms of the [contractual] provisions governing cancellation." The court's responses to the jury were made over Nationwide's objections.

The jury rendered a verdict in favor of the Smallys and MMB on their breach of contract claims and breach of the implied covenant of good faith and fair dealing causes of action. It awarded the Smallys $338,596, representing the amount of policy benefits that Nationwide failed to pay. In addition, the jury awarded the Smallys damages of $110,000 for loss of rental value as a result of Nationwide's breach of the implied covenant of good faith and fair dealing. The jury also found that Nationwide wrongfully failed to pay MMB $338,596 in policy benefits and that MMB's additional damages for breach of the implied covenant of good faith and fair dealing were $347,582. The jury found that Nationwide acted with malice, oppression or fraud against MMB. The jury then heard expert testimony on the issue of Nationwide's financial condition. The jury determined that MMB was entitled to $1.2 million in punitive damages.

Nationwide thereafter moved for a directed verdict as to MMB's claim for punitive damages. It argued that MMB had not presented clear and convincing evidence of oppressive, fraudulent, or malicious conduct. It further contended that MMB had not presented any competent evidence of Nationwide's net worth or financial condition. The court denied the motion.

Nationwide also moved for judgment notwithstanding the verdict (JNOV) and for a new trial, contending that there were irregularities in the proceedings, the evidence was insufficient to support the verdict, and that the damages award was excessive. The court denied the motions.

Finally, prior to entering judgment, the court considered whether the jury's verdict awarding $338,596 in policy benefits to both the Smallys and MMB was duplicative. The court determined that the award was duplicative and entered judgment ordering

6

Nationwide to pay the sum of $338,596 in policy benefits to MMB, $110,000 in damages for breach of the implied covenant of good faith and fair dealing to the Smallys, an additional sum of $347,582 in damages for breach of the implied covenant of good faith and fair dealing to MMB, and $1,200,000 in punitive damages to MMB. Further, the court awarded "*Brandt*"[5] fees in the amounts of $179,438 to the Smallys and $300,000 to MMB. The court also awarded costs and interest to the Smallys and MMB from the date of the verdict. The Smallys appealed from the judgment. Nationwide cross-appealed from the judgment and the court's order denying its motion for JNOV and for a new trial.

## II. DISCUSSION

### A. The Smallys' Appeal

The Smallys contend that the trial court erred in ruling that the jury's verdict awarding them $338,596 in policy benefits was duplicative of the award to MMB. We conclude that the trial court's ruling was correct.

*Burns v. California FAIR Plan Assn.* (2007) 152 Cal.App.4th 646 (*Burns*) is dispositive. In *Burns*, the holder of a life estate in a residence and the holder of a trust in the remainder interest both sought to recover the full value of a residence from their insurer when the home was destroyed by fire. (*Id.* at p. 649.) The court held that when there are two separately insurable interests under a policy, both cannot recover the maximum policy benefits under the policy "without regard to the value of the destroyed property. Our Supreme Court long ago recognized that the nature of insurance does not provide for recovery in excess of the value of the property destroyed where there is but one loss." (*Id.* at p. 653.) Quoting the seminal case of *Davis v. Phoenix Ins. Co.* (1896) 111 Cal. 409, 415–416, the *Burns* court determined that the insurers were required to pay only a pro rata payout of the loss according to the value of the insureds' interest in the destroyed property: " 'Insurance is a contract whereby one, for a consideration, undertakes to compensate another if he shall suffer loss. It is a contract of indemnity. [¶] "This principle underlies the contract, and it can never, without violence to its essence

---

[5] *Brandt v. Superior Court* (1985) 37 Cal.3d 813 (*Brandt*).

7

and spirit, be made by the assured a source of profit, its sole purpose being to guarantee against loss or damage." [Citation.]' . . . If an insured's interest 'extends to the whole of the subject matter of the property,' the insured may recover up to the value of the property, subject to any policy limitation. . . . However, if the interest of the insured is less than the whole of the property, 'his right is limited, not by the value of the property, but by the value of his interest. The very meaning of the term "*indemnity*" excludes all idea of profit to the insured.' . . . To permit a recovery for more than the value of the insured's interest 'would greatly tend to the destruction of like property under like circumstances, and open the door and tempt men to enter therein for fraudulent purposes.' " (*Burns,* at p. 653.)

Here, as well, both the Smallys and MMB had an insurable interest in the property—the Smallys, as the named insured, and MMB as the lienholder. (Ins. Code,[6] § 662; *Mackey v. Bristol West Ins. Service of Cal., Inc.* (2003) 105 Cal.App.4th 1247, 1267 (*Mackey*) [section 662's use of the disjunctive " 'or' " between " 'named insured, lienholder *or* additional interest' " indicates that each of the three entities has a separate insurable interest].) " 'Every interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest.' (§ 281.) 'In common parlance, we speak of a house as being insured, but, strictly speaking it is not the house but the interest of the owner therein that is insured, and, whether that interest is founded upon a legal title, an equitable title, a lien, or such other lawful interest therein as will produce a direct and certain pecuniary loss to the insurer by its destruction, he has an insurable interest therein.' " (*Burns, supra*, 152 Cal.App.4th at p. 651, quoting *Davis v. Phoenix Ins. Co.*, *supra,* 111 Cal. at p. 414.)

While both the Smallys and MMB were insured under the policy, Nationwide was required to pay the policy benefits to only one for the value of the property. (*Burns*, *supra*, 152 Cal.App.4th at p. 653.) As the *Burns* court explained, "[w]hile it cannot be

---

[6] All further statutory references are to the Insurance Code.

8

denied that Burns and the Trust had separately insurable interests, it does not follow that both could recover the maximum allowed" and that any such recovery would be in excess of the loss suffered and could not be reconciled with the Supreme Court's language in *Davis* noting that an insured is not entitled to profit from insurance. (*Ibid.*) The jury awarded $338,596 each to the Smallys and MMB, the actual cost value of the property at the time of the fire. This represented a double recovery of policy benefits under the policy, and an amount in excess of the loss suffered. (See *Burns, supra*, 152 Cal.App.4th at p. 653.) The trial court therefore properly determined that the $338,596 awarded by the jury in damages to the Smallys was duplicative of the same amount awarded to MMB.

The Smallys' reliance on *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686 is misplaced. *Roby* involved a wrongful termination action in which the jury awarded compensatory and noneconomic damages for three claims — wrongful termination in violation of public policy, discrimination, and failure to accommodate — and listed the economic damages for each claim. (*Id.* at pp. 692–693, 699.) The trial court awarded the economic damages only once but the court treated the jury's findings of noneconomic losses for these same causes of action cumulatively. (*Id.* at pp. 699–700.) On appeal, the court held it was possible that the jury's awards of noneconomic damages overlapped to some extent and that a new trial would be necessary. (*Id.* at p. 705.) But, rather than face a new trial, the plaintiff conceded during oral argument that the noneconomic damages awards were overlapping. (*Ibid.*) Hence, while *Roby* did consider whether the compensatory damages awarded by the jury were supported by the evidence, it does not stand for the proposition that the court will uphold "the entire amount of the damages [awarded by the jury] whether the jury expresses that amount in a single verdict or multiple verdicts referring to different claims or legal theories." Rather, *Roby* recognized that " '[d]ouble or duplicative recovery for the same items of damage amounts to

overcompensation and is therefore prohibited.' " (*Id.* at p. 702; quoting *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158–1159.)[7]

The Smallys requested an additur or a new trial on the issue of contract damages, arguing that they were entitled to $691,500, the repair costs of the property, rather than simply the actual cash value. The Smallys contend that Nationwide was not entitled to rely on the repair and replace provisions of the policy since it denied coverage under the policy.

To the extent the Smallys' motion for a new trial on the issue of contract damages has any traction given the court's prior ruling that the jury's verdict constituted a duplicate recovery of contract damages, the Smallys' argument is nevertheless without merit. The policy provided that "[w]hen the cost to repair or replace the damage is more than $1000 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed." The Insurance Code similarly provides that "[i]f the policy requires the insured to repair, rebuild, or replace the damaged property in order to collect the full replacement cost, the insurer shall pay the actual cash value of the damaged property, as defined in Section 2051, until the damaged property is repaired, rebuilt, or replaced." (§ 2051.5, subd. (a); See *Minich v. Allstate Ins. Co.* (2011) 193 Cal.App.4th 477, 486 (*Minich*) [insureds' breach of contract claim fails as a matter of law because neither the policy nor statutory law required insurer to pay full replacement cost without regard to whether the property was repaired or replaced].)

Here, the Smallys' theory at trial was that they were entitled to the cost of repairs under the policy regardless of whether they repaired and rebuilt the property. The law does not so provide. (§ 2051.5, subd. (a); *Minich*, *supra*, 193 Cal.App.4th at p. 486.) The court's order was correct.

---

[7] The Smallys also contend that the trial court erred in denying their motion for a new trial on the issue of damages. Given that MMB was entitled to the policy benefits, this contention lacks merit.

The Smallys argue that the trial court also erred in denying their motion for prejudgment interest.  This issue is moot given our determination that the jury's contract damages award to the Smallys was duplicative of that awarded to MMB.

Finally, the Smallys contend that if we uphold the verdict for MMB, we should remand the matter to the trial court to declare their loan from MMB paid in full and order MMB to reconvey the note and the deed of trust on the property to them. As the trial court ruled, there is no authority for such an order.

First, the Smallys did not plead a declaratory relief action seeking this relief. Hence, MMB had no opportunity to present evidence on the issue.  Second, there is nothing in the record to support the Smallys' factual allegation in its brief that the loan was paid.  To the contrary, the only evidence in the record on the question of the Smallys' liability on the loan is that at the commencement of trial, the Smallys owed MMB $686,178 on the loan and that interest continued to accrue.  Thus, even if Nationwide pays the $686,178 in damages to MMB, the Smallys' loan will not have been paid in full as interest on the loan continues to accrue.  Further, there was no vehicle before the court to make a determination that the jury's award of damages to MMB extinguished the Smallys' loan debt to MMB.  As the trial court ruled, there was simply no authority for the declaration and order sought by the Smallys.

## B.  Nationwide's Cross-appeal

## 1.  Breach of contract claims

Nationwide contends that the trial court erred in denying its motion for a JNOV and that the jury's verdicts in favor of the Smallys and MMB are not supported by substantial evidence.

The standard of review of an order denying a JNOV motion and from an appeal challenging the evidence to support a jury verdict is the substantial evidence standard. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 845.)  When an appellant challenges the sufficiency of the evidence, we apply the substantial evidence standard of review.  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.)  " ' "[T]he power of an appellate court begins and

11

ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citations.] An appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact." (*Id.* at pp. 959–960.)

While the trial court did not award the Smallys the contract damages of $338,596 because the award was duplicative, we consider whether substantial evidence supports that award because it is the basis of Nationwide's liability to the Smallys for breach of the implied covenant of good faith and fair dealing. (See *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 663 [without a breach of contract, there can be no liability for bad faith on the part of the insurer].) We thus must determine whether Nationwide established that it effectively cancelled the Smallys' policy on the property. We conclude that there was substantial evidence supporting the jury's finding that it did not.

"In California, there is no such thing as substantial compliance in furnishing notice that an insurance policy has been cancelled. [Citation.] Termination of coverage can only be accomplished by strict compliance with the terms of any statutory provisions applicable to cancellation. [Citations.] Likewise, the insurer must adhere closely to all policy provisions setting forth requirements as to the time and manner of giving notice of cancellation to the insured. (*Naify v. Pacific Indemnity Co.* (1938) 11 Cal.2d 5, 10; *Lee* [*v. Industrial Indemnity Co.* (1986) 177 Cal.App.3d 921,] 924–925.) '*If a cancellation is defective, the policy remains in effect even if the premiums are not paid.* [Citation.]' [Citations; italics added.]" (*Mackey, supra,* 105 Cal.App.4th at p. 1258.)

Here, Nationwide acknowledges that it did not mail a notice of cancellation of the Smallys' policy to MMB in the manner required by paragraph 15 of the policy. Nationwide contends, however, that this failure had no effect on the proper cancellation of the Smallys' policy and that the trial court incorrectly advised the jury on this issue. We cannot reconcile this contention with the plain terms of the policy.

12

The policy contains two provisions respecting notice of cancellation to the lienholder. Paragraph 15 requires that the mortgagee "be notified at least 10 days before the date cancellation takes effect." In the separate lender's loss payable endorsement, it states: "[i]n the event of failure of the insured to pay any premium or additional premium which shall be or become due under the terms of this policy . . . this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from and within one hundred and twenty (120) days after due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder that the Lender when so notified in writing by this Company of the failure of the Insured to pay such premium shall pay or cause to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefor. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said written notice by the Lender."

We are cognizant of the precedents holding that " 'the protected interests and notice requirements of the named insured and lienholder are separate and a policy can be canceled as to one but remain in effect as to the other.' " (*Mackey*, *supra*, 105 Cal.App.4th at p. 1267; *Savarese v. State Farm Etc. Ins. Co.* (1957) 150 Cal.App.2d 518, 522.) The policy here, however, by its plain terms, required that Nationwide notify MMB ten days before the cancellation of the policy became effective.

*Mackey* is distinguishable because the insurance contract in that case included only one cancellation provision pertaining to the lienholder: the lenders loss payable endorsement. (*Mackey, supra,* 105 Cal.App.4th at pp. 1266–1268.) We agree with *Mackey*'s holding that such a provision is a contract between the insurance company and the lienholder separate and apart from the contract between the insurance company and the policyholder. Like *Mackey*, the insurance policy issued to the Smallys included a lenders loss payable endorsement. But unlike *Mackey*, it also included a provision, paragraph 15, that included a different cancellation requirement, i.e., that "the mortgagee shall be notified at least 10 days before the cancellation takes place." Because MMB was

13

not notified ten days before the policy was cancelled, it was not unreasonable for the jury to conclude that Nationwide's failure to adhere to the cancellation requirements of paragraph 15 regarding MMB constituted an ineffective cancellation of the Smallys' policy.

Nationwide argues that paragraph 15 had no effect on whether it properly cancelled the Smallys' policy because the loss payable endorsement provides different cancellation provisions, and the provisions of an endorsement control when it conflicts with the policy. We cannot agree.

Nationwide did not try the case on this theory and did not make this argument until after the jury began deliberating and had questions concerning the meaning of the notice provisions of paragraph 15. (See *Curcio v. Svanevik* (1984) 155 Cal.App.3d 955, 960; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 407, pp. 466–468.) Both the Smallys and Nationwide argued to the jury that the plain meaning of paragraph 15 required Nationwide to provide MMB ten days' notice before the cancellation of the policy became effective. They further argued that, had MMB received the notice, it would have secured payment of the premiums thus ensuring continued coverage for the Smallys. Although Nationwide's claims adjuster testified, under cross-examination, that paragraph 15 applied only to MMB's coverage, Nationwide did not argue to the jury that paragraph 15 was only an independent obligation to MMB; instead, it argued that it had sent MMB a notice of cancellation on July 23, 2008, and if MMB "really wanted to do anything, they could have tried to do something, but they didn't." This, of course, does not address the question because the July 23 cancellation notice was sent *after cancellation*, presumably pursuant to the loss payable endorsement which pertained only to MMB's coverage, not the Smallys'.[8]

---

[8] Nationwide's only other argument was that MMB "say[s] it would have made a difference had they gotten some notice by Nationwide ten days before cancellation went into effect, but experience shows it made no difference. They wouldn't have done anything [because MMB did not reinstate a previous insurance policy that had lapsed]." This argument is pure speculation.

The language of Paragraph 15 was reasonably susceptible to the interpretation offered by the Smallys and MMB. In construing an insurance contract, the provisions are interpreted in their ordinary and popular sense unless the terms are " 'used by the parties in a technical sense, or unless a special meaning is given to them by usage.' " (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666, quoting Civ. Code, §§ 1638, 1639, 1644.) "If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." (*Id*. at pp. 666–667.) Indeed, here, the jury read the language of Paragraph 15 in the same manner suggested by the Smallys and MMB. Based on this reading of the policy, it was reasonable for the Smallys to expect that MMB would be notified at least 10 days before the cancellation of their policy became effective.

Paragraph 15's notice provision thus served not only to protect MMB — by providing it with the opportunity to cure any failure by the Smallys to pay the premium before it cancelled the policy — but it also served to protect the Smallys because it left their policy in effect until proper cancellation was given to MMB. (See *Home Savings of America v. Continental Ins. Co.* (2001) 87 Cal.App.4th 835, 842 [typical consideration given by lienholder in return for obtaining a standard loss payable clause is lienholder's promise to pay premiums on demand].)

In order to validly effect notice of cancellation under the policy, Nationwide was required to "adhere closely to all policy provisions" on the requirements for notice. (*Mackey*, *supra*, 105 Cal.App.4th at p. 1258.) It is undisputed that Nationwide failed to give MMB the ten-day notice required by Paragraph 15. Hence, under the terms of the policy, Nationwide failed to effect cancellation of any portion of the policy.

The court's responses to the jury questions during deliberations were therefore correct given the language of the policy. The responses were consistent with *Mackey* which recognizes that if a cancellation is defective, the policy remains in effect even if the premiums have not been paid. (*Mackey, supra,* 105 Cal.App.4th at p. 1258.) Thus, Nationwide's argument that the court's responses to the jury's inquiries were erroneous is without merit.

15

Nationwide next contends that the evidence fails to support the jury's finding that the damage caused by the fire was only a partial loss. It argues that the evidence showed that the property had "lost its identity or specific character as a building" and was a total loss, thus entitling MMB to only the fair market value of the property or $153,000.

Nationwide relies on the jury instruction given in *Williams v. Hartford Ins. Co.* (1880) 54 Cal. 442, 450–451 which provided, " '[a] total loss does not mean an absolute extinction. The question is not whether all the parts and materials composing the building are absolutely or physically destroyed, but whether, after the fire, the thing insured still exists as a building. Although you may find the fact that after the fire a large portion of the four walls were left standing, and some of the iron-work still attached thereto, still if you find that the fact is that the building has lost its identity and specific character as a building, you may find that the property was totally described within the meaning of the policy.' "

As MMB points out, however, Nationwide did not argue the theory of loss of identity establishing a total loss to the jury. While it argued that the Smallys' loss was a total loss under the policy and it set the actual cash value at $153,000, it argued that the actual cash value was dependent on whether the jury found a partial loss or a total loss under the policy as the terms were defined under the Insurance Code. Its "loss of identity" definition for total loss represents a new theory never submitted to the jury or otherwise presented in the trial court. It cannot now change its theory on appeal.[9] (*Curcio v. Svanevik, supra,* 155 Cal.App.3d at p. 960.) Moreover, Nationwide does not contend that the jury was erroneously instructed nor has it provided the jury instructions in the record on its appeal. An appellant has a duty to show error by an adequate record. (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435.) Finally, the parties' closing

---

[9] For this reason, we decline to consider the out-of-state cases cited by Nationwide to support its loss-of-identity test theory. (See *Motors Ins. Corp. v. Division of Fair Employment Practices* (1981) 118 Cal.App.3d 209, 220 [while decisions from other state or federal courts may be persuasive, they are not binding on us].)

arguments reflect that the jury was instructed in accordance with the Insurance Code respecting the definitions of partial and total loss.[10]

The record contains substantial evidence supporting MMB's position that the Smallys suffered a partial loss of the property. Kevin Dawson, the Smallys' insurance expert, testified that the damage to the property constituted a partial loss under the policy because the wood-framed walls and the floor system were salvageable and while the property suffered significant damage, it was repairable. Similarly, MMB's expert, Peter Evans, an insurance loss adjuster, testified that the damage to the property constituted a partial loss based on his experience of handling thousand of claims. And, even Nationwide's estimator, who evaluated the loss shortly after the fire, estimated the extent of the damage as $338,596 based on the cost of repairing the property on an actual cost value basis. Given this evidence, the jury had before it substantial evidence supporting its finding of policy benefits owed in the amount of $338,596.

### 2. Bad faith claims

A cause of action for breach of the implied covenant of good faith and fair dealing is established when an insurer " 'fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy . . . .' " (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920, quoting *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574.) "Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim. '[T]he covenant of good faith and fair dealing implied in all insurance agreements entails

---

[10] Section 2051, subdivision (b) provides: Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, shall be determined as follows: [¶] (1) In case of total loss to the structure, the policy limit of the fair market value of the structure, whichever is less. [¶] (2) In case of a partial loss to the structure, or loss to its contents, the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. In case of a partial loss to the structure, a deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure."

17

a duty to investigate properly submitted claims . . . . (Citations.)' " (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 878–880.)

Here, the evidence showed that Nationwide's investigation of the Smallys' claim was clouded by its preliminary determination that the policy was cancelled for nonpayment of the premium.[11] Though it investigated the claim under a reservation of rights and sent its adjuster to make an estimate of the loss on the property, it continued to rely on its notice of cancellation as precluding coverage under the policy. Nationwide's underwriting manager opined that the notice of cancellation to the Smallys was valid based on reviewing a copy of the notice and the proof of mailing document.[12] He had a general understanding of Nationwide's process for mailing notices of cancellation, but did not know the entire process until he called the mailroom in Des Moines two years later in preparation for his deposition. He did not know if an individual in the mailroom checked to be sure that letters were sent to the persons on the proof of mail register.

Nationwide applied no specific weight to the fact that the Smallys claimed they had not received the notice of cancellation and their claim did not change its investigation or findings. Nor did Nationwide consider whether the notice of cancellation was sent to MMB. This fact was particularly unreasonable in view of Paragraph 15 in the policy which required Nationwide to give MMB ten days' notice before cancellation of the policy became effective.

"An unreasonable failure to investigate amounting to such unfair dealing may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, *supra*, 78 Cal.App.4th at p. 880.) Nationwide knew it had a problem with MMB respecting its failure to give the ten-day notice but opined that "we would

---

[11] Nationwide sent the Smallys the reservation of rights letter on August 7, 2008, just days after the fire, and denied coverage based on nonpayment of the premium on December 9, 2008.

[12] The proof of mailing register was 40 pages, containing the names and addresses to which letters had been sent on July 3, 2008, and the postage and fees paid. There was no indication on the register reflecting what type of letter was mailed.

owe the mortgagee even if we weren't going to pay the insured." Based on Paragraph 15 of the policy requiring notice to MMB in the event of cancellation, the jury could reasonably infer that Nationwide acted in bad faith by not investigating whether it could validly cancel the policy in view of the express condition in the policy requiring notice to the mortgagee prior to the effectiveness of any cancellation.

Nationwide's argument that the genuine dispute rule precludes a finding of bad faith lacks merit. The genuine dispute rule precludes liability for bad faith when the insurer's denial or delay of policy benefits is due to a genuine dispute with its insured as to the existence of coverage or the amount of the claim. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723.) "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." (*Ibid.*)

Here, Nationwide essentially froze the Smallys' policy based on the nonpayment of premium in July 2008. It cancelled the policy as of July 18, 2008, and did not notify MMB ten days prior to the cancellation. Moreover, it made no adjustment to the policy based on its adjuster's report on July 10, 2008, indicating a higher reconstruction value of $461,000 because it considered the policy already cancelled even though the report indicating a higher value was received prior to the cancellation. Indeed, Nationwide notified the Smallys just days after the fire that it would investigate the claim but the fact that the policy was cancelled at the time of the fire "supported [its] ongoing coverage investigation." In sum, Nationwide took the position that the policy was cancelled as to the Smallys prior to conducting a thorough investigation of their claim. It cannot claim a "genuine dispute" when it failed to investigate whether it had fully complied with the notice provisions under the policy.

The jury's damages award of $110,000 for the Smallys' economic loss as a result of Nationwide's bad faith is supported by the record. Dawson, the Smallys' insurance expert, testified that the fair rental value of the property was $2,500 per month and that the Smallys lost rental income from the date of the loss until trial plus an additional ten

19

months, the time needed to obtain a permit and rebuild the property. Based on this evidence, counsel for the Smallys asked for $110,000 for lost rent for a period of 44 months. The evidence supports the verdict.

Nationwide also contends that there is no substantial evidence to support the verdict in favor of MMB on its bad faith claim. It argues that there was no evidence that the Smallys' increased mortgage balance was attributable to its failure to pay policy benefits.

This contention has merit. At the time the Smallys secured the policy, they owed MMB approximately $420,000 on their mortgage.[13] While the amount owing on the mortgage had increased to $686,178 at the time of trial, all of the increase cannot be attributed to Nationwide's delay in paying policy benefits. In order to support an award of bad faith damages, the damages must be proximately caused by the insurer's wrong. (Civ. Code, §§ 3300, 3333; *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 528.) " 'An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract.' " (*Ibid.*, quoting *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659.)

Here, the jury awarded MMB the amount of $347,582 in tort damages, which coupled with the contract damages of $338,596, equaled $686,178, the amount of the Smallys' mortgage loan balance at the time of trial. While MMB argued that it was entitled to the entire amount of the loan as a result of Nationwide's bad faith, that is not the law. MMB was entitled to only the consequential damages it suffered as a result of Nationwide's bad faith. (*State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, *supra*, 9 Cal.App.3d at p. 528.) At the very least, the evidence showed that the Smallys' mortgage

---

[13] As of September 29, 2008, almost two months after the fire, the amount of the mortgage had increased to $480,088.08.

arrears incurred prior to the fire cannot be attributable to Nationwide's bad faith in denying MMB's claim. There remains the question whether all or any portion of the arrears accruing after the fire were the proximate result of Nationwide's failure to pay MMB its policy benefits. Since the jury's award of consequential damages reflects that it awarded MMB the full amount necessary to pay off the Smallys' mortgage, we must remand the matter to the trial court for a redetermination of the bad faith damages suffered by MMB.

### 3. *Punitive damages*

The jury awarded MMB $1.2 million in punitive damages. Nationwide contends that the verdict cannot be upheld because there was no evidence presented of its net worth. It argues that the evidence that MMB presented concerning the financial condition of Nationwide's parent company was irrelevant and speculative.

Nationwide waived the issue. The record demonstrates that prior to trial, MMB served Nationwide with a Notice of Request for Attendance at Trial of the person most knowledgeable in California of Nationwide's financial condition.[14] Nationwide did not object to the notice. While it had filed an earlier objection to a similar notice to attend filed by the Smallys, objecting that the person most knowledgeable was not located in California and could not be compelled to attend, those objections were filed prior to MMB's notice to attend and the record does not contain any objections to MMB's notice.[15] Nationwide refused to produce a witness.[16]

---

[14] Under Civil Code section 1987, subdivision (b), a notice to attend serves as a substitute for a subpoena requiring a witness to appear at trial. (See *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London* (1995) 34 Cal.App.4th 554, 559.)

[15] Both the Smallys' and MMB's notice to attend requested Nationwide to produce the witness most knowledgeable *in California* of Nationwide's financial condition. (See *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London*, *supra*, 34 Cal.App.4th 554, 559 [geographical reach of notice to attend is limited by Code Civ. Proc., § 1989 which provides that a witness is not required to appear before a court unless the witness is a resident within the state at the time of service].)

[16] In a post-trial opposition to Nationwide's JNOV motion challenging the punitive damages award, MMB showed that Nationwide could have produced Bob

At trial, MMB presented evidence of Nationwide's net worth through the testimony of Dawson, who testified that he reviewed Nationwide Financial Services' (NFS) annual report, a February 18, 2011 press release announcing NFS's record earnings, a database system of the Securities Exchange Commission including the 10-K for NFS that was a consolidated financial report of Nationwide's multiple entities, and documents found on Nationwide's website. Dawson testified that NFS, the parent company, had earnings of $1.1 billion, and that the net operating income for its underwriting property and casualty insurance companies including Nationwide was $655 million.

Nationwide objected to this evidence and presented no witnesses on the issue of punitive damages. Indeed, the trial court ruled in denying Nationwide's motion for a new trial, that "Nationwide made the calculated decision not to send the [person most knowledgeable (PMK)] . . . to testify about Nationwide's assets, arguing that the PMK was beyond the subpoena power of the court. MMB then put on its expert to give testimony on the financial worth of Nationwide. Nationwide made the calculated choice to not produce a witness and not present any evidence." It cannot now be heard to complain that the evidence was insufficient to support the verdict. (See *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 608–609 [defendant who failed to produce evidence of net worth despite being ordered to do so waived any right to complain of lack of evidence]; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1338 [defendant who failed to comply with subpoena for records is estopped from challenging punitive damages award based on lack of evidence of his financial condition].)[17]

MMB argued that the jury should award $2.4 million based on Nationwide's bad faith practice of treating a partial loss as total and paying only fair market value instead of

O'Hollearn, the Pacific Coast Regional Director for Nationwide, who was knowledgeable about the financial condition of Nationwide and was a California resident.

[17] We recognize that the annual report of the NFS did not set forth the individual net worth of Nationwide. (See *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1282–1283.)

paying the actual cash value, a difference of roughly $200,000 in this case. It further argued that Nationwide's own witness admitted that it did this routinely approximately 10 to 12 times in the last four years.

While it is impossible to determine what evidence the jury relied upon in determining its verdict, it had before it evidence of the net operating income of Nationwide and other underwriting property and casualty companies within NFS as well as evidence relating to the profits Nationwide gained by its misconduct in utilizing a fair market value analysis rather than actual cash value. (See *Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1298–1301 [evidence of profits wrongfully gained by defendant is adequate evidence upon which to base punitive damages award].) No error appears.

Nationwide further contends that there was no substantial evidence of oppression, fraud, or malice to support an award of punitive damages. The evidence, however, demonstrated that Nationwide not only unreasonably delayed and denied coverage, insisting that the fire caused a total loss of the property despite its own investigation showing a partial loss, it had a policy and practice of undervaluing coverage on policies such as the Smallys that provided for replacement cost at actual cash value. It maintained that in the absence of a definition for actual cash value on the policies it could utilize fair market value instead of replacement cost at actual cash value less depreciation, undervaluing the claim by almost $200,000. And, it had done so in 10 to 12 cases in the last four years. Further, Nationwide continually delayed in providing information to MMB about the Smallys' claim. It not only delayed in giving MMB a copy of the policy, it also failed to reveal the adjuster's report showing only a partial loss and setting forth the actual cash value owed to the Smallys. Instead, it sent MMB excerpts of the policy omitting the key provisions at issue including the lender loss payable endorsement and the provision respecting the time limit for repairing the property after a loss. In sum, there was substantial evidence presented to demonstrate the reprehensibility of Nationwide's conduct.

23

## 4. *Attorney fees*

Nationwide contends the record fails to support an award of attorney fees. We conclude that the court's award of fees to the Smallys must be modified.

In an insurance bad faith action, the insured is entitled to an award of attorney fees incurred to recover policy benefits. (*Brandt, supra,* 37 Cal.3d 813, 817.) "[T]he fees recoverable 'may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable.' (*Brandt, supra,* 37 Cal.3d at p. 819.) In short, the plaintiff is entitled to legal fees attributable to the contract recovery but not fees attributable to the tort recovery." (*Howard v. American National Fire Ins. Co., supra,* 187 Cal.App.4th at p. 534.) Fees attributable to both the contract and tort causes of action must be apportioned. (*Ibid.*)

In contingency fee situations, apportionment of fees is calculated by determining "the percentage of the legal fees paid to the attorney that reflects the work attributable to obtaining the contract recovery. . . . [¶] To determine the percentage of the legal fees attributable to the contract recovery, the trial court should determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, with some hours assigned to the contract and some to the tort. This latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 812 (*Cassim*).)

"[E]ntitlement to attorney fees as compensatory damages is premised on an insured's need to hire an attorney to vindicate his or her contractual rights under an insurance policy." (*Cassim, supra,* 33 Cal.4th at p. 807.) "The key question [then] is how much did it cost the insured—how much were [their] damages—to hire an attorney when [their] insurer acted in bad faith and denied the benefits due [them] under [their]

24

policy." (*Id.* at p. 809.) That the court ultimately determined the Smallys' judgment on their contract claim was duplicative of the policy benefits awarded to MMB does not mean that the Smallys' attorney's efforts were unnecessary. To the contrary, due to Nationwide's bad faith in processing the Smallys' claim for benefits under the policy, they were required to employ the services of an attorney to collect the benefits due under the policy. Consequently, they can recover attorney fees as damages. (*Id.* at pp. 807, 810 [*Brandt*'s premise is that plaintiffs should recover as tort damages the fees incurred to recover their policy benefits].)

Nationwide contends that the court's calculation of fees in the amount of $179,438 to the Smallys is incorrect because it included the damages the Smallys recovered on their bad faith claim. While the court did not err in basing the award on the total compensatory damages awarded to the Smallys, the court did not apportion the time attributable to the contract recovery in its calculation.

*Cassim* dictates that here, where the Smallys agreed to a 40 percent contingent fee agreement,[18] the correct calculation of fees is 40 percent of the compensatory award of damages — in this case 40 percent of $448,596 or $179,438. That amount must then be apportioned between the time attributable to the contract and tort causes of action. (*Cassim, supra,* 33 Cal.4th at p. 812.)

The Smallys' attorney acknowledged in his declaration in support of his request for fees that he spent a total of 1,205.1 hours on the case — 852.1 hours were attributable to the contract claim and 48.7 hours were attributable to intertwined tort and contract issues. He allocated half of the latter hours or 24.35 hours to those allocated to the contract claim for a total of 876.45 hours. Thus, 876.45 divided by 1,205.1 or 72.7 percent of the hours were attributable to the contract recovery. Calculating 72.7 percent of the total legal fees of $179,438 results in the sum of $130,451 in *Brandt* fees. We must therefore modify the award of attorney fees to the Smallys to $130,451.

_____

[18] The Smallys' attorney stated at the hearing on the attorney fees issue that that the Smallys had a 40 percent contingency fee agreement.

25

Nationwide also argues that the evidence does not support the award of fees to MMB. The court awarded fees of $300,000 to MMB.

The record supports the court's award. MMB requested fees of $518,405 out of $636,165 fees that were incurred. Of the $518,405 fees, MMB calculated that 66 percent of $33,600 in fees were incurred in pursuit of intertwined contract and bad faith issues, and $496,229 of fees were incurred in pursuit of coverage under the policy. Inasmuch as the attorney fees incurred by MMB were based on hourly billings from its attorneys, declarations from MMB's attorneys that allocated and apportioned the designated legal work and corresponding billing were submitted in support of MMB's request for fees. (See *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1079–1080 and fn. 13 [apportionment can be determined from hourly billings designating proper allocation of legal work].)

At the hearing on the attorney fees motion, the court remarked that it was concerned about the number of attorneys MMB had used in the case. MMB had used different attorneys in its pre-litigation efforts to resolve the matter, and changed attorneys in December 2010 once a trial date had been set. The court opined that the fees were reasonable for MMB's trial counsel which amounted to $384,420. The court ultimately awarded MMB fees in the amount of $300,000, apparently discounting the fees requested by $218,405 that were attributable to a large extent to the attorneys that represented MMB prior to trial.

The court's reward was reasonable. An award of attorney fees rests within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion, for example, where the amount of the award is "so large or small that it shocks the conscience and suggests passion and prejudice influenced the determination." (*Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485, 1507.) In making its determination, the trial court considers a number of factors including "the necessity for and the nature of the litigation, the amount involved, and the success or failure of the attorney's efforts, including the amount of recovery." (*Kanner v. Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 569.) Based on a consideration of various factors, the trial

court may rely on its own expertise and knowledge to calculate reasonable attorney fees. (*Niederer v. Ferreira*, *supra*, 189 Cal.App.3d at p. 1507.) The court is not limited to the affidavits submitted by the attorney. (*Melnyk v. Robledo* (1976) 64 Cal.App.3d 618, 625.) Here, the attorneys for MMB apportioned the amount of fees attributable to both the contract and mixed contract/tort issues and determined that the amount of fees incurred attributable to those issues was $518,405. On these facts, we cannot conclude that an award of $300,000 in fees was unreasonable.

## 5. *New trial motion*

Finally, Nationwide asserts that the trial court erred in denying its motion for a new trial. It argues that the court should have granted its motion in limine No. 11 to preclude evidence that Fairfield promised the Smallys that the policy limits would be increased after an adjuster evaluated the property.

The court ruled that the evidence was admissible because Fairfield was an agent of Nationwide and thus Fairfield's representations were relevant on the issue of the policy sold to the Smallys. The court's ruling was correct as Fairfield's representations as an agent of Nationwide were binding on Nationwide. (See *Loehr v. Great Republic Ins. Co.* (1990) 226 Cal.App.3d 727, 734.)

Nationwide also raised issues on its new trial motion pertaining to the punitive damages award, attorney fees, insufficiency of the evidence to support the verdict, and error in the court's responses to the jury's questions during deliberations. We have discussed those issues above and conclude that only the award of attorney fees to the Smallys must be modified.

## III. DISPOSITION

The judgment in favor of the Smallys is modified to reflect an award of attorney fees in the amount of $130,451. The judgment awarding MMB bad faith damages in the amount of $347,582 is reversed and the matter is remanded to the trial court for a recalculation of the amount of MMB's bad faith damages. In all other respects, the judgment is affirmed. The Smallys and MMB are to recover their costs on appeal.

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Humes, J.