Filed 1/31/25  National General Premier Ins. Co. v. Haro CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| NATIONAL GENERAL PREMIER INSURANCE COMPANY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DIANA HARO et al.,<br><br>Defendants and Appellants. | B325849<br><br>(Los Angeles County Super. Ct. No. 21STCV26582) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara A. Meiers, Judge.  Reversed.

Lari-Joni & Bassell and Torsten M. Bassell for Defendant and Appellant Diana Haro.

Bentley & More, Gregory L. Bentley and Matthew W. Clark for Defendant and Appellant Anella Valeros.

Patrick Howe Law and Patrick M. Howe for Plaintiff and Respondent.

————————————

In October 2020, appellant Diana Haro purchased a second car, a Dodge Challenger, and shortly thereafter lent the Challenger to a friend, Jason Carpenter.  Carpenter was involved in an accident which seriously injured Anella Valeros, a passenger in the Challenger.  Haro promptly reported the accident to her insurer, respondent National General Premier Insurance Company (National General), through Ezone Insurance Services (Ezone).  National General filed this action against Haro, Carpenter and Valeros, seeking a declaration that it had no duty to defend or indemnify Haro or Carpenter because the Challenger was not a covered automobile at the time of the accident.  The trial court granted National General's motion for summary judgment.

Haro and Valeros appeal from the judgment, contending the trial court erroneously granted summary judgment because there are triable issues of fact as to whether Haro timely asked National General to insure the new automobile.  We agree and reverse and remand this matter for further proceedings.

## BACKGROUND

In October 2020, Haro had an automobile insurance policy with National General which covered her 2017 Audi.  She obtained this policy through Ezone.

National General used Ezone to communicate with Haro, sending policy correspondence to Ezone to forward to Haro.  In the policy it issued for the 2017 Audi, National General repeatedly referred to Ezone as a co-presenter of the policy, and directed Haro to contact Ezone if she had any questions about the policy.  Ezone had authority to bind insurance instantly on behalf of National General.

On October 25, 2020, Haro purchased a 2020 Dodge Challenger as a second car.

On Friday, November 6, 2020, Haro sent the following email to Ezone: "Hi Celeste, hope all is well. [C]an I please [g]et a quote for a auto policy on a 2020 Dodge Challenger? [¶] Let me know what other information you need." Haro offered evidence that based on her past dealings with Ezone, this email would be treated as a request for a policy. In the past, when she asked them for a quote, she got a policy "in return." Ezone replied and asked for the vehicle identification number (VIN) of the vehicle.

On Monday, November 9, 2020, at 8:21 a.m., Haro emailed the VIN number to Ezone. At 4:12 p.m., Ezone replied: "You want to add or replace? [¶] What coverage [do] you need?"[1] At 7:10 p.m., Haro replied, "Add please. It would need to be full coverage."

At some point, Haro allegedly gave Carpenter permission to drive the Challenger. At 11:45 p.m. on November 9, 2020, Carpenter lost control of the Challenger as he drove down Soledad Canyon Road and the vehicle slammed into a tree. Valeros, who was a passenger in the Challenger, alleged she suffered serious injuries, including a broken femur, five broken

---

[1] It is not clear why Ezone asked this question. The policy provisions for a replacement vehicle are different than for an additional newly acquired auto, and the parties have not briefed any replacement issues. We note that the policy language concerning coverage for a replacement vehicle does not appear to require a request for coverage: "If a 'newly acquired auto' replaces a vehicle shown [in] the Declarations, coverage is provided for this vehicle without your having to ask us to insure it."

ribs, a fractured pelvis, a fractured spine, a punctured lung and extensive abrasions.

Haro learned of the accident on the morning of Tuesday, November 10, 2020. She promptly informed Ezone of the accident. Ezone offered evidence that on November 10, it provided Haro with a telephonic quote for insurance for the Challenger and that she declined the quote. In her own deposition testimony Haro denies receiving a quote from Ezone. At 5:19 p.m., Ezone sent an email to Haro stating, "Please be advise[d] there is no coverage at this moment on the new car until we added to the policy." On November 12, 2020, Ezone sent an email to Haro asking, "Please let me know if you like to add a car to the same policy or if you want me to look for new policy for you?"

On December 9, 2020, Valeros sent a policy limit demand letter to Haro. On January 5, 2021, National General sent a letter to Valeros's counsel denying the claim because "The vehicle involved in this accident was not a covered/listed auto on the policy of Diana Haro."

On March 16, 2021, Valeros filed a personal injury action against Haro and Carpenter. On July 1, 2021, National General offered Valeros the $100,000 policy limit for Haro's policy. Valeros rejected the offer.

On July 20, 2021, National General filed this declaratory relief action, naming Haro, Valeros and Carpenter as defendants. National General sought a declaration that it did not have a duty to defend or indemnify Haro or Carpenter because the Challenger, at the time of the accident, was not a covered automobile under Haro's policy.

In August 2022, National General moved for summary judgment on the ground that the Challenger was not a covered automobile under Haro's existing policy because Haro did not ask National General to insure it within 14 days after she acquired it, as required by the terms of her existing policy. National General computed the 14-day period as ending on Saturday, November 7. Specifically, it contended "Haro never asked the company to insure it. In fact, she never asked her broker to insure it with anyone. All she did was ask for a premium quote, and when she got the quote, she declined it."

It is undisputed that Haro's pre-accident communications with National General about the Challenger occurred over a period of several days, beginning on Friday, November 6, 2020 and continuing until 7:10 p.m. on Monday, November 9, 2020, several hours before Carpenter's crash. National General did not agree that any of those communications qualified as "asking" it to insure the Challenger. It further contended that the last day for Haro to request coverage would have been Saturday, November 7, 2020. National General contended that Haro did not even provide all the information needed for a quote until the November 9, 7:10 p.m. email. Ezone then gave Haro a quote for insurance on November 10, 2020, which Haro rejected.

In opposition, Haro offered evidence disputing National General's claim that Ezone gave her a quote for insurance which she rejected. She also offered legal argument that the 14-day period to ask for coverage ended on November 8, 2020, but because that day was a Sunday, she had until Monday, November 9, 2020 to ask for coverage, and coverage was extended until that date as well.

5

In its reply brief, National General repeated its original contentions and added another point in response to Haro's opposition. It contended that "Nowhere in their oppositions do defendants offer any evidence that Ezone communicated a quote to Ms. Haro before the accident or that Ms. Haro accepted a quote before the accident. According to defendants' own evidence, these two steps were necessary before Ezone could bind coverage." In support of this contention, National General cited only the deposition testimony of an Ezone employee.

The trial court found that the period of time to request coverage was extended until Monday, November 9, 2020. Nevertheless, the trial court granted summary judgment in favor of National General because it found that "asking" for insurance coverage was not sufficient. For a request for coverage to be valid, the parties had to have first agreed on all terms of the coverage. The trial court wrote: "Even though the court agrees with [Haro]'s contention that her late response (on a Sunday) for information that might have eventually led, after further discussion, to a policy being issued, would and could be deemed to have been timely as of the next 'business day,' which by law means the following Monday, one day after expiration of the 14 day period to " 'request' " coverage for the new car, the fact that the terms of that potential coverage had never been discussed much less communicated in some final form means that there was nothing to be " 'requested.' "

The trial court explained its basic rationale as follows: "[I]t is important to note some basic principles of contract and agreement formation for a number of fundamental contract principles preclude the court from being able to find that the parties in this case formed any sort of a contract or agreement,

6

much less a mutually enforceable one [on] Monday, November 9. No matter how one views the matter, the parties' purported contract lacked essential material terms, including but not limited to the requirement of 'mutuality of remedy.' "

This appeal followed.

## DISCUSSION

We review a grant of summary judgment de novo. (*Shiver v. Laramee* (2018) 24 Cal.App.5th 395, 400.) Summary judgment is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We strictly construe the moving papers and liberally construe the opposing papers, with the papers viewed in the light most favorable to the appellant and all doubts about the propriety of granting the motion resolved in favor of its denial. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.)

The interpretation of an insurance policy, including whether a particular policy provides a potential for coverage, is a question of law. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.) We independently review matters presenting pure questions of law not involving the resolution of disputed facts, and give no deference to the trial court's ruling or the reasons for its ruling, but instead decide the matter anew. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) "Whether a clause is ambiguous and whether an insured has an objectively reasonable expectation of coverage under the policy are questions of law subject to independent review on appeal." (*Union Oil Co. v. International Ins. Co.* (1995) 37 Cal.App.4th 930, 936.)

7

A.     Temporary Coverage for a Newly Acquired Auto

The policy provides that for a newly acquired auto: "Coverage begins on the date you become the owner.  However, for this coverage to apply to a 'newly acquired auto' which is in addition to any vehicle shown in the Declarations, you must ask us to insure it within 14 days after you become the owner."  Both parties agree that under settled California law, this language provides automatic temporary 14-day coverage for a newly acquired automobile, with no request for coverage required.  A request is required only to continue the coverage past that 14-day period.  (See *Birch v. Harbor Ins. Co.* (1954) 126 Cal.App.2d 714, 720–721 (*Birch*).)  They disagree about how to compute the 14-day period.

Haro calculates the 14-day period for both the automatic temporary coverage and the request for continuing permanent coverage as ending on Sunday, November 8, 2020.  She contends both the temporary coverage and the time to make a request for continued permanent coverage were extended by law to the next day, Monday, November 9, the day of the accident.  National General calculates the terms for both as ending on Saturday, November 7, 2020.  National General contends that even if the periods ended on Sunday, November 8, the law did not extend those periods.

1.     *Extension of Period to Request Continuing Coverage*

We agree with the trial court that the initial period to request continued coverage ended on Sunday, November 8, 2020.  National General appears to calculate its asserted end date of November 7 by counting the day the automobile is acquired as day one.  It offers no legal authority for this method of calculating

8

the time period, and barely any substantive argument to support it. We find its contention inconsistent with both the plain language of the policy and common usage.

National General is correct that the policy states that coverage begins on the day the insured becomes the owner of the automobile. In referring to the period in which a request for continued coverage must be made, however, the policy uses the phrase "within 14 days *after* you become the owner." (Italics added.) This indicates that the counting of days begins the day following the acquisition of the automobile. Further, under National General's reading, the phrase "within one day" of an event would mean the day of the event. This is not the common or ordinary meaning of the phrase. The common or ordinary phrase for the day of the event would be "the same day" as the event. While the quoted language refers to the time to request continued coverage, there is no basis to find that the policy itself intentionally created a one-day gap between the end of the temporary coverage and the end of the period to request continuation of that coverage.[2]

We also agree with the trial court that the time period to request long-term coverage was extended by law to Monday, November 9, 2020.

---

[2] In any event, as we discuss in more detail below, under the facts of this case, it does not matter whether the temporary coverage expired on Saturday, November 7, 2020 or Sunday, November 8, 2020.

An insurance policy is a contract. (See, e.g., *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1074.) Civil Code section 11 provides, "Whenever any act of a secular nature, other than a work of necessity or mercy, is appointed by law or contract to be performed upon a particular day, which day falls upon a holiday, it may be performed upon the next business day, with the same effect as if it had been performed upon the day appointed." (Civ. Code, § 11.)

It is well established under California law that the phrase "upon a particular day" includes the last day of a period for performance. As appellant points out, *Northey v. Bankers' Life Ass'n.* (1895) 110 Cal. 547 involved an obligation that had to be paid "during the month of April, 1893." (*Id*. at p. 549.) The last day of the time within which to pay fell on a Sunday (April 30). (*Ibid*.) Our Supreme Court pointed out that the contract "in no way fixes the day or date of maturity. It might be the last or any other day of the month." (*Id*. at p. 550.) Relying on Civil Code section 11, the identical language of Code of Civil Procedure section 13, and case law, the Court found that because the insured "had to and including the last day of April to pay the assessment against him, and as that day was Sunday, he was, under the law, as declared by the Codes and the cases cited, entitled to make the payment at any time during the ensuing Monday." (*Northey*, at pp. 552–553.) Thus, it is the last day within the period appointed by law that is relevant when evaluating an extension. (See also *Wilcox v. Engebretsen* (1911) 160 Cal. 288, 291 (*Wilcox*) ["The thirty days allowed for filing objections would have expired on February 23, 1908, but for the fact that that day fell on a Sunday," with Civ. Code, § 11 extending the time to the next day]; *Law v. Title Guarantee &*

*Trust Co.* (1928) 91 Cal.App. 621, 624–625 [interpreting Civ. Code, § 11 to extend a deadline required "within 30 days" to the next business day when the last day fell on a holiday]; *Kells v. Pearson* (1922) 56 Cal.App. 502, 505 [real estate purchase contract allowed "payment within fifteen days"—when last day fell on a Sunday, the period was extended to the following business day]; *Milovich v. City of Los Angeles* (1941) 42 Cal.App.2d 364, 374–375 [applying Civ. Code, § 11 to a contract that required performance "on or before the last day of the month" to extend performance from a Sunday to the following business day].)

National General contends we should instead apply the reasoning of *Certain Underwriters at Lloyd's v. Argonaut Ins.* (N.D.Ill. 2006) 444 F.Supp.2d 909 (*Argonaut*), *Griffin v. Dingley* (1896) 114 Cal. 481 (*Griffin*) and *Cheney v. Canfield* (1910) 158 Cal. 342 (*Cheney*).  We decline to do so.

The *Argonaut* decision was issued by a federal district court in another state and is not persuasive.  The decision does not cite or consider any case law interpreting Civil  Code section 11 or its legislative history.  (*Argonaut, supra*, 444 F.Supp.2d. at p. 922.)

Our Supreme Court in *Griffin* considered section 1192 of the former Political Code, which applies to elections.  (*Griffin, supra,* 114 Cal. at p. 483.)  As the Court explained later in a different case, "*Griffin* dealt with a different situation than is present here.  The statutes in [*Griffin*] counted backward from a given date—election day—to insure that no new candidates would emerge within a given time period and ballots could be printed identifying all candidates.  In the present situation, by contrast, the statute is forward-looking, limiting the time in which one can file a lawsuit against a public agency to insure

11

that claims are not stale and evidence is available.  [Citation.] The holiday extension would not interfere with the purpose of the statute since such a brief extension would be innocuous to the availability of witnesses and evidence."  (*DeLeon v. Bay Area Rapid Transit Dist.* (1983) 33 Cal.3d 456, 459, fn. omitted.)

The Court in *Cheney* considered the application of Civil Code section 11 to corporate by-laws and found section 11 did not apply because by-laws are not contracts.  (*Cheney*, *supra*, 158 Cal. at p. 348.)  Thus, the discussion of section 11 in *Cheney* is dicta. Further, in a subsequent opinion, the Supreme Court did cite Civil Code section 11 in support of its statement that "[t]he thirty days allowed for filing objections would have expired on February 23, 1908, but for the fact that that day fell on a Sunday.  The time was thereby extended to February 24th."  (*Wilcox*, *supra*, 160 Cal. at p. 291.)

National General also contends that *Gans v. Smull* (2003) 111 Cal.App.4th 985 "instructs" that the Legislature intended to limit application of Civil Code section 11 only to situations where the act to be performed falls on a specific day.  (*Id.* at p. 990.) The *Gans* court was not concerned with the application of Civil Code section 11, and in no way considered or addressed any of the caselaw cited above which holds that Civil Code section 11 does apply when the last day of a period of time for performance falls on a Sunday or holiday.

We conclude that because the 14-day period to perform, that is, to make a request for continued coverage, fell on a Sunday, Civil Code section 11 extends the period to Monday, November 9, 2020.

### 2.     *Extension of the Period of Temporary Coverage*

The trial court did not directly discuss the end date of the actual temporary coverage period, but its conclusion that there was no coverage on November 9, 2020 indicates that the trial court did not believe that the temporary coverage itself was automatically extended from Sunday, November 8, to Monday, November 9.  We agree that the end date of the temporary coverage was co-extensive with the initial end date to request continuing permanent coverage, but unlike the request for continuing permanent coverage, the temporary coverage itself was not extended to November 9, 2020.

It is well settled under California law that "[t]he option to renew the policy does not extend the period of the policy to cover a loss occurring between expiration of that period and the termination of the period available for exercise of the option. (*Upton v. Travelers Ins. Co.* (1919) 179 [Cal.] 727, 729, 178 P. 851.)"  (2 Witkin, Summary of Cal. Law (11th ed. 20204) Insurance, § 320.)  In *Upton*, the plaintiff obtained an automobile insurance policy; under the terms of the policy, coverage ended on October 12, 1914, as did the end of the period to exercise the option to renew coverage.  (*Upton*, at pp. 728–729.)  The plaintiff was involved in an accident on October 13, 1914.  (*Id.* at p. 729.)  As the Supreme Court explained: "The fact that October 12th was a legal holiday does not aid the plaintiff.  The policy expired by its terms on the twelfth day of October at noon."  (*Ibid*.)  "[Civil Code s]ection 11 does not purport to do more than to extend the time for exercising the option where it expires on a holiday."  (*Ibid*.)  The plaintiff did not exercise that option.  "The mere existence of such unexercised option, extending beyond the period of insurance specified in the policy, cannot operate to extend the

13

period of insurance so as to cover an accident which happens between the expiration of the insurance and the termination of the option. The only thing extended by the statute is the time for exercising the option, not the time of insurance against the happening of an accident." (*Id*. at pp. 729–730.)

The Court in *Upton* was not faced with and so did not consider the effect of a valid exercise of an option on the day after the policy expired, where the asynchronicity of the premium expiration and the option expiration is due to a statutory extension. We hold that in such cases, the exercise of an option for continued coverage (here, by making a request) would necessarily have the effect of continuing (or extending) the temporary coverage without interruption, the same as if the request were made on the day the temporary coverage expired. To hold otherwise would be to make the extension of the option period meaningless.

B.    Request for Continued Coverage

The trial court interpreted Haro's policy as providing coverage for a newly acquired automobile only if the parties agreed upon all the terms of coverage and National General issued, or possibly just agreed to issue, a policy by Monday, November 9, 2020. This ignores the plain language of the policy.

The policy clearly and unequivocally states that for collision "coverage to apply, you must *ask* us to insure it within [¶] (1) 14 days after you become the owner." (Italics added.) This language does not require the insured to do anything other than ask; it does not require a response from the insurer.

The policy could have, but did not, use the words the trial court added. The policy did not stipulate that coverage would apply only if 1) the insured specified the amount of coverage

14

desired or 2) the insurer offered a quote for the requested coverage or 3) the insured accepted the quote or 4) the insurer issued a policy within 14 days after the automobile was acquired. In other words, the trial court ignored the way the policy was actually written in favor of the trial court's view of the way the policy should have been written.

The trial court's expressed concerns about the absence of material contractual terms are addressed in the policy and in well-settled California law.

The extension of the temporary protection provision for newly acquired automobiles is not a new concept in automobile insurance. It was analyzed, as early as 1954, in *Birch*. Although there are some differences between the relevant policy provision in *Birch* and the policy provision in this case, for our purposes they are virtually identical. The insured in *Birch* was required to "notify" the insurer of acquisition of a newly acquired car; here the insured was required to "ask" the insurer for such coverage. As the Court of Appeal explained in *Birch*, "under such policy provisions as here appear there is automatic coverage after the delivery of the newly acquired automobile during the period in which notice may be given, and . . . the requirement of notice is merely a condition subsequent which must be complied with in order *to keep such coverage in effect beyond that period.*" (*Birch*, *supra*, 126 Cal.App.2d at p. 719, italics added.) The *Birch* court added: "A reasonable person might reasonably assume from the language used that automatic coverage of a newly acquired automobile was provided for 30 days, which would then cease in the event the required notice was not given." (*Id.* at p. 720.) In other words, under well-established law and the terms of her policy, Haro automatically received coverage for her newly

acquired automobile for 14 days, and that coverage *continued* if she "asked" for it to continue.

Both the scope of coverage for the new automobile and the continuation of that coverage is specified in the policy language. The policy describes the coverage provided in the initial temporary 14-day period as follows: "For any coverage provided in this policy except Coverage For Damage To Your Auto, a 'newly acquired automobile' *will have the broadest coverage we now provide* for any vehicle shown in the Declarations." (Italics added.) This same subdivision further provides, "Coverage begins on the date you become the owner. However, *for this coverage* to apply to a 'newly acquired auto' . . . you must ask us to insure it within 14 days after you become the owner." (Italics added.)

Thus, under well-established law and the clear policy language, Haro did not need to specify what coverage she wanted for her new auto, because under the terms of her existing policy, she could only obtain the same coverage she had for her current auto.

As for what National General could charge Haro during the remainder of the policy period, that was not an unlimited or entirely unknown amount. Haro knew the premium for liability coverage for her current automobile. While this amount could increase with the addition of a second automobile, the policy sets forth certain limits on how that increased premium could be calculated. Part F General Provisions of the policy provides that "**B.** If there is a change to the information used to develop the policy premium, we may adjust your premium. Changes during the policy term that may result in a premium increase or decrease include, but are not limited to, changes in: [¶] 1. The

16

number, type or use classification of insured vehicles[.]" The policy specifies that "If a change resulting from **A**. or **B.** requires a premium adjustment, we will make the premium adjustment in accordance with our manual rules."

If appellant did not wish to accept the increased premium, she could cancel the policy or simply choose not to pay the increased premium and wait for National General to cancel the policy. The policy provides that the insured may cancel by giving "advance written notice of the date cancellation is to take effect."[3] The terms of the policy and Insurance Code sections 661 and 662 require respondent to give 10 days notice if it intends to cancel the policy for non-payment of the premium. To be clear, "the Legislature intended to provide policyholders with a 10–day period *after default* before the insurer can effectively cancel the policy." (*Mackey v. Bristol West Ins. Services of Cal., Inc.* (2003) 105 Cal.App.4th 1247, 1265.) Thus, even assuming for the sake of argument that an increased premium was due on the day Haro asked for coverage for the new auto, her request occurred at the earliest on November 6, 2020, and that would be the earliest possible date for non-payment. The policy could not be cancelled by respondent until 10 days later, and so would have still been in effect on November 9, 2020 when the accident occurred. Whether Haro could have incurred an obligation to pay some or all of the

---

[3]     In its separate statement in support of summary judgment, respondent offered evidence that Haro's insurance agent gave her a quote for the increased premium and Haro rejected it. Haro disputed this evidence. We note that under the terms of the policy, Haro's verbal statement does not appear sufficient to cancel the policy. She could cancel either by giving written notice or returning the policy.

17

premium once she asked for continued coverage is a determination that would depend on an analysis of the entire policy, which we elect not to undertake sua sponte.

We note that National General does not directly defend the trial court's concerns about the absence of a negotiation over mutually agreed-upon terms in connection with a request for continuing coverage made within the 14-day period.  Rather, National General contends the trial court's concerns are applicable to another provision of the policy, which applies to a coverage request made after the 14-day period.  This section of the policy provides: "If you ask us to insure a 'newly acquired auto' after a specified time period described below has elapsed, any coverage we provide for a 'newly acquired auto' will begin at the time you request the coverage."  Haro relies on this provision on appeal to argue that even if coverage had expired, her 7:10 p.m. email on November 9, 2020 would have reinstated it.  As indicated above, we do not believe that Haro need rely on this provision for her request for continued coverage to be timely.

We cannot agree with National General that this provision, if relied upon by Haro, would warrant a full discussion and agreement by the parties about type of coverage and premium amounts before any new insurance contract could be validly formed.  Perhaps, if the language quoted by National General constituted the complete provision, it could suggest that the parties are starting off with a blank slate.  It is not the complete provision, however.  National General omits the first sentence of that provision, which states:  "Coverage for a 'newly acquired auto' is provided as described below."  Immediately below this section is the statement, discussed above, that "a 'newly acquired auto' will have the broadest coverage we now provide for any

18

vehicle shown in the Declarations." Thus, all of our analysis above about a timely request applies with equal force to this provision.

National General makes the argument that as a matter of law, insurance "applications and quotes" are not contracts; they are proposals, or in contract terms, offers. We believe this overstates the law, but in any event the two cases cited by National General are not helpful, as they involve the formation of insurance contracts by parties with no pre-existing relationship or policy. (*Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020 [insurer and insured new to each other negotiated terms without benefit of pre-existing contract or coverage]; *Linnastruth v. Mut. Benefit etc. Assn.* (1943) 22 Cal.2d 216 [court discussed actual written terms of the specific insurance application completed by the insured].) Thus, they are inapt.

C.    The Issue of Ambiguity

National General contends that Haro and Valeros are barred from claiming that the policy language is ambiguous because each failed to identify any language in the policy as ambiguous in response to an interrogatory propounded by respondent on this topic. National General has forfeited this claim by failing to support it with cogent legal argument or relevant legal citations. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) We note that National General has asserted two different claims—one in the header which refers to "policy language" and one in the text underneath which refers to "any agreement." This is another reason for forfeiture. (*Id.* at p. 153 [" 'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' "].)

19

We note that the contentions by Haro and Valeros described by National General as claims of ambiguity are simply claims that California law applies to the calculation of time periods. Appellants are not contending that the policy is ambiguous and we have found that the policy language concerning the commencement of counting is clear and not ambiguous.

National General also contends that Haro's presentation of evidence about her course of dealing with Ezone about coverage for the Challenger is really an argument that the policy is ambiguous. We disagree. Haro's claim is that the policy is clear and requires nothing more than that she "ask" for or "request" continued coverage. Asking or requesting can take many forms; this does not necessarily make the words ambiguous. The primary relevance of Haro's past course of dealing with Ezone was to show that Ezone understood her November 2020 emails as a request for coverage for the Challenger.

In this regard, National General claims the words "ask" and "request" should not be given their plain and ordinary meaning, but instead should be interpreted to require the use of certain specific words. Alternatively, it contends that "ask" and "request" describe a process: identifying the terms of coverage sought, requesting such coverage, receiving a quote, accepting the quote, and getting a policy issued. As Haro says, National General's view at most results in a latent ambiguity. (See *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 [" 'Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' "].) At this point, we do not see any

extrinsic evidence from National General to support its contention. It simply claims that "ask" and "request" have specific narrow meanings in its insurance policy which are at variance with the common understanding of those words.

D.     Request for Coverage

As we have explained, Haro was entitled to request a continuation of the temporary coverage for the Challenger through November 9, 2020. She offered evidence that her November 6 email would be understood by Ezone as a request for coverage. Haro agrees, however, that this is a disputed fact.

Similarly, Haro's provision of the Challenger's VIN number at Ezone's request in the morning of November 9, 2020 could be understood as confirming that the November 6 email was a request for coverage in light of the parties' prior course of conduct.

Haro's email at 7:10 p.m. on November 9, 2020 was unequivocally a request for continued coverage. Haro contends that Ezone had the ability to bind coverage at any time, but the parties have not analyzed the effect of the time of the request. Was it after normal business hours? If it was, how did Ezone and/or National General respond to after-hours requests? Was it sufficient to send the email request before midnight on November 9?

These disputed issues of material fact related to Haro's emails render summary judgment improper.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings.  Respondent to pay costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:


WILEY, J.


VIRAMONTES, J.